Vincent R. CHASTANG

v.

**FLYNN AND EMRICH COMPANY et al.**

Frank UGIANSKY

v.

**FLYNN AND EMRICH COMPANY et al.**

Civ. A. Nos. 71-593-M, 71-652-M.

United States District Court,
D. Maryland.

Aug. 14, 1973.

As Amended Sept. 5, 1973.

Memorandum and Order Oct. 26, 1973.

Harry Goldman, Jr., Baltimore, Md., for plaintiffs.

Paul L. Cordish and David S. Cordish, Baltimore, Md., for defendants.

JAMES R. MILLER, Jr., District Judge.

These companion cases, which were consolidated for trial, are premised upon an alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., with respect to the non-contributory retirement plan[1] of Flynn and Emirch Company (hereinafter referred to as F&E). The "liability" portion of a bifurcated trial has now been completed. Plaintiffs are two retired male employees of F&E who claim that the plan discriminated against them on the basis of sex because female employees were entitled to retire earlier and receive greater retirement benefits than male employees similarly situated.

Vincent Chastang was hired by F&E in February, 1937, and retired effective July 25, 1968, at the age of 52. Frank Ugiansky was hired by F&E in January, 1951, and retired effective March 24, 1969, at the age of 42.[2] Upon retiring, Chastang received $27,779.56 from the retirement fund while Ugiansky received $12,404.14. In each case this amount represented only about 50% of plaintiffs' accrued retirement benefits under the plan.

Both plaintiffs, after receiving "right to sue letters" from the Equal Employment Opportunity Commission (EEOC), brought suit in this court alleging that defendant had discriminated against them on the basis of sex in paying them only 50% of their vested interests in the retirement plan. Defendants are F&E which is engaged in the foundry business, The Equitable Trust Company which acts as trustee for the plan, and the five members of the F&E Profit

---

1. The retirement plan entitled, "Employees' Profit Sharing and Retirement Trust Agreement," will herein be referred to at various times in the text as a retirement plan, pension plan, or trust.

2. Frank Ugiansky has since been rehired by F&E and began working for the company again in 1971.

Sharing Trust Committee and their successors who administer the plan.

3. Copies of the original retirement plan drawn in December, 1943, and the subsequent amendments thereto are contained in PX 3–A through 3–H. The amendment dated December 8, 1970 (PX 3–H), equalized the vesting benefits between males and females effective as of that date. This opinion, however, will deal with the plan as it existed prior to the December 8, 1970, amendment. The relevant provisions of the plan prior to that date are as follows:

"ARTICLE V—RETIREMENT AGE AND DESIGNATION OF DEATH BENEFICIARY

"1. RETIREMENT AGE. Every female Participant, who becomes a Participant before she has reached her sixtieth (60th) birthday, and every male Participant who becomes a Participant before he has reached his sixty-fifth (65th) birthday and who is not disentitled by reason of the prior termination of his or her service with the Company, as more fully provided in Article VII hereof, shall be entitled to the retirement benefits if living upon such birthday. If, however, the Company desires to continue to employ a female Participant after she reaches her sixtieth (60th) birthday, or a male Participant after he has reached his sixty-fifth (65th) birthday and such Participant elects to continue such employment, such Participant shall not be entitled to the retirement benefits hereof until the date of the actual termination of the services of such Participant with the Company. At any time after a female Participant shall have attained the age of fifty-five (55) years or at any time after a male Participant shall have attained the age of sixty (60) years, such Participant may, at the option of the Company, be retired, and, under such circumstances, such Participant shall be entitled to all the retirement benefits hereof. Every female Participant, who becomes a Participant after she has reached her sixtieth (60th) birthday, and every male Participant who becomes a Participant after he has reached his sixty-fifth (65th) birthday shall be entitled to the retirement benefits hereof upon the date of the termination of services with the Company of such Participant, and not before that date.

⸱ ⸱ ⸱ ⸱ ⸱

"ARTICLE VII—TERMINATION OF SERVICE AND VESTING OF RIGHTS

"1. *Vesting of Interest of Participant in Trust Fund.* When a male Participant shall have completed a period of two (2) years' continuous service with the Company after having become a Participant, five per cent (5%) of his proportionate interest in the

Under the provisions of the plan,[3] the retirement age for men was 65 and for Trust Fund shall become non-forfeitable and thereafter upon the completion by him ⸱ of each additional year of continuous service with the Company in excess of two (2) years and up to eleven (11) years, an additional five (5%) per cent of his proportionate interest shall become non-forfeitable, so that at the end of eleven (11) years' continuous service with the Company fifty (50%) per cent of his proportionate interest in the Trust Fund shall have become non-forfeitable. Such non-forfeitable interest shall not ⸱exceed fifty (50%) per cent except as hereinafter provided. When a female Participant shall ⸱have completed a period of ⸱two (2) years continuous service with the Company after having become a Participant ten (10%) per cent of her proportionate interest in the Trust Fund shall become non-forfeitable and thereafter upon the completion by her of each additional year of continuous service with the Company in excess of two (2) years and up to eleven (11) years, an additional ten (10%) per cent of her proportionate interest shall become non-forfeitable so that at the end of eleven (11) years continuous service with the Company one hundred (100%) per cent of her proportionate interest in the Trust Fund shall have become non-forfeitable. The period of continuous service of any Participant with the Company shall be determined by the Committee and shall be measured by the total years of participation in the plan, and not by years of service with the Company. Provided, however, that if any Participant shall become entitled to the retirement benefits hereof or shall die or shall be declared by the Company to be totally incapacitated while in the service of the Company or terminate his employment with the Company in time of war solely to enter the armed forces of the United States or shall voluntarily or involuntarily go on hourly or wage basis of compensation, the entire one hundred (100%) per cent of his or her proportionate interest in the Trust Fund shall become non-forfeitable without regard for his or her period of service. Until the interest of any Participant shall become non-forfeitable, as hereinbefore provided, it shall be deemed to be and is hereinafter referred to as a forfeitable interest in the Trust Fund. After any such interest in the Trust Fund shall become non-forfeitable such interest shall be deemed to be and is hereinafter referred to as non-forfeitable interest in the Trust Fund and shall be and become payable to such Participant or his Beneficiary or Beneficiaries only pursuant to, the provisions of this Plan."

women, 60. The plan permitted early retirement at the option of the company for employees of both sexes. However, benefits for females under the plan vested at twice the rate as for males such that females who retired early and had worked for the Company for 11 years could receive 100% of their accrued benefits, while males of the same status could receive only 50% of their accrued benefits. Only if a male employee alternatively worked until age 65, died, became totally disabled, voluntarily or involuntarily went on an hourly wage scale, or had his employment terminated as the result of a sale of a portion of the company's operating assets, could he receive all of his accrued benefits under the plan. Otherwise, if a male retired early after 11 years' service, 50% of his accrued retirement benefits would be deemed to be forfeited under the plan.

*Jurisdiction*

In an earlier proceeding in this case the issue was raised as to whether plaintiffs had complied with the filing prerequisites of Title VII. Specifically, defendants maintained that 42 U.S.C. § 2000e–5 had not been satisfied because plaintiffs had not refiled their charges with the EEOC after the charges had been referred by the EEOC to the Maryland Human Relations Commission. This court ruled at that time that, under the Supreme Court's decision in Love v. Pullman, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), plaintiffs were not required to refile their complaints with the EEOC subsequent to waiver by, or inaction of, the Human Relations Commission.[4]

■ Defendant Trust Committee members, via a motion for a directed verdict at the close of plaintiffs' case, raised another procedural question upon which the court reserved ruling and which now must be considered before reaching the merits of the cases. These

defendants maintain that the court lacks jurisdiction over them (and therefore the trust itself) because the Trust Committee members, although parties in this case, were not made parties to the EEOC proceedings. These defendants therefore contend that plaintiffs have failed to comply with 42 U.S.C. §§ 2000e–5(a) and (e), now 42 U.S.C. § 2000e–5(b) and (f)(1).[5]

The members of the Trust Committee named in the complaints are Charles T. Turner, James F. Turner, Jr., James F. Turner, III, Stuart Olivier, Louis B. Weller, and their successors. The actual trustee at all relevant times was The Equitable Trust Company which was a party in the EEOC proceedings as well as in the present cases.

Plaintiffs contend that the principles of Trust Law mandate that one seeking to obtain money from the corpus of a trust sue the trustee and that they have done so both here and before the EEOC. In addition, they assert that the members of the Trust Committee are all officers and/or directors of F&E. Thus, plaintiffs argue that the conciliation policy of Title VII was satisfied because the EEOC had an opportunity to attempt to obtain voluntary compliance from the persons at F&E who were in a position to take remedial action either as officers or directors or as members of the Trust Committee. Defendants deny that the evidence at trial established a substantial identity between the directors of F&E and the members of the Trust Committee. They also rely upon Mickel v. South Carolina State Employment Service, 377 F.2d 239 (4th Cir. 1967), cert. denied, 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166 (1967), for the proposition that a person or entity who was not the subject of a complaint made to the EEOC cannot later be made a party to a civil suit arising out of that complaint.

4. Ugiansky v. Flynn & Emrich Co., 337 F. Supp. 807 (D.Md.1972).

5. 42 U.S.C. § 2000e–5(1970), as amended, Equal Employment Opportunity Commission Act of 1972, 86 Stat. 104.

The Trust Agreement itself as well as other evidence indicates that The Equitable Trust Compnay was little more than a nominal trustee. Its duties were limited generally to bookkeeping and investment recommendations while the Trust Committee actually administered the trust in the legal sense of the term, "trustee."[6] It is unnecessary, however, to consider whether the proper party was before the EEOC in terms of Trust Law. The evidence at trial was sufficient in the court's view to satisfy the procedural requirements of 42 U.S.C. §§ 2000e–5(b) and (f)(1).

 The policy of Title VII in general and 42 U.S.C. § 2000e–5(b) and (f)(1) in particular is to provide an employer or labor organization charged with discrimination with notice of the charge and to provide a forum for informal negotiations and conciliation efforts between the EEOC and the charged party before the controversy progresses to an adversary proceeding. Johnson v. Seaboard Air Line Railroad Co., 405 F. 2d 645, 651 (4th Cir. 1968), cert. denied sub nom., Pilot Freight Carriers, Inc. v. Walker, 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451 (1969); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720 (7th Cir. 1969). An *actual* attempt by the EEOC to eliminate an unlawful employment practice by means of voluntary compliance, however, is not a jurisdictional prerequisite to the institution of a civil suit. The policy of the Act is satisfied as long as the EEOC is given the *opportunity* to mediate an unlawful employment practice with a view toward obtaining voluntary compliance. Stebbins v. Nationwide Mutual Ins. Co., 382 F.2d 267, 268 (4th Cir. 1967), cert. denied, 390 U.S. 910, 88 S.Ct. 836, 19 L. Ed.2d 880 (1968); Johnson v. Seaboard Air Line Railroad Co., *supra.*

Clearly, if a party to a civil suit was not a party before the EEOC, there was not even an *opportunity* for the Commission to attempt to obtain voluntary compliance from that particular party, thus frustrating the policy of the Act. This is the thrust of the Fourth Circuit's decision in Mickel v. South Carolina State Employment Service, *supra.* The facts of that case, however, are easily distinguishable from those involved here.

In *Mickel* the plaintiff sued the South Carolina State Employment Service and the Exide Battery Company after having charged only the former before the EEOC. Plaintiff claimed racial discrimination in her attempt to secure employment with Exide through the Employment Service even though she was never referred to Exide by the Employment Service, never directly contacted Exide, and never had any direct dealings with Exide. Plaintiff's sole theory for upholding jurisdiction as to Exide was that the Employment Service was Exide's agent for purposes of referring persons to Exide for employment by virtue of the fact that Exide had registered with the Employment Service as a prospective employer. The Fourth Circuit found this contention "utterly lacking in merit" stating that there was no indication that the Employment Service acted as Exide's agent to implement an Exide purpose of invideous discrimination. As the court observed, "Exide was not 'named in the charge' filed with the Commission, and the Commission was not required to enter into any conciliatory negotiations with Exide." 377 F.2d at 242. Exide was thus a completely separate entity having no relevant connection to the party charged before the EEOC. That is not the situation here.

According to the Commission decisions[7] in these cases, F&E was served

---

6. Employees' Profit Sharing and Retirement Trust Agreement, Arts. II, VIII, IX, X— (hereinafter referred to as "Trust Agreement" in the footnotes).

7. The EEOC decisions, Chastang v. Flynn & Emrich Co., Case No. YDC 9–134, Decision

No. 72–1988 (June 14, 1972) (PX4), and Ugiansky v. Flynn & Emrich Co., Case No. YDC 1–138, Decision No. 72–1989 (June 14, 1972) (PX5), were admitted into evidence without objection in the exercise of the court's discretion in order to provide a convenient summary of the proceedings before

with Vincent Chastang's charge to the EEOC on March 13, 1969,[8] and with Frank Ugiansky's charge on June 30, 1970.[9] In both cases this occurred after the charges had been referred to the Maryland Human Relations Commission and the EEOC had resumed jurisdiction. A "right to sue letter" was issued to Chastang on or about May 11, 1971, and to Ugiansky, on or about June 8, 1971. This factual sequence demonstrates that any attempt to obtain voluntary compliance in these cases by the EEOC would have had to occur between March, 1969 and June, 1971. During this time period, Charles T. Turner, James F. Turner, Jr., and James F. Turner, III, were all officers and/or directors of F&E.[10] These same three individuals were also members of the five-man Trust Committee [11] during this period as well as prior and subsequent thereto. In fact, the three Turners are

the only members of the Trust Committee who signed the December 8, 1970, amendment to the plan which equalized the vesting requirements and benefits for males and females.[12] Messrs. Turner, Jr., and Turner, III, even signed the amendment in two places, in their capacities as president and secretary of F&E, respectively, and as members of the Trust Committee. This is consistent with the terms of the Trust Agreement which stated, "[t]he right is reserved *to the Company*, together with the consent in writing of the majority of the Committee, to amend [the] Agreement." [13]

It is apparent from these facts that the three Turners were, if not *the* persons, at least among the persons at F&E with whom the EEOC would have had to deal to obtain voluntary compliance. While the Turners may have technically represented their company before the EEOC as officers and/or directors dur-

the EEOC to the extent that they form jurisdictional prerequisites to the proceedings in this court. The court is aware that these judicial proceedings are *de novo* in nature and has not relied upon the EEOC decisions in reaching conclusions upon disputed issues of law or fact. See Cox v. Babcock and Wilcox Company, 471 F.2d 13 (4th Cir. 1972); Robinson v. Lorillard Corporation, 444 F.2d 791, 800–801 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Contra, Smith v. Universal Services, Inc., 454 F.2d 154 (5th Cir. 1972).

8. Chastang alleges that the act of discrimination as to him occurred on July 25, 1968, the effective date of his retirement. He originally filed his charge in the district office of the EEOC on October 22, 1968. The charge was referred to the Maryland Human Relations Commission on October 28, 1968. On October 30, 1968, the Maryland Commission waived jurisdiction and the EEOC assumed jurisdiction.

9. Ugiansky alleges that the act of discrimination as to him occurred on March 24, 1969, the effective date of his retirement. He originally filed his charge in the district office of the EEOC on April 23, 1969, and it was referred to the Maryland Human Relations Commission on the next day. On June 27, 1969, more than 60 days having expired from the date of referral, the EEOC assumed jurisdiction.

10. The evidence indicates that Charles T. Turner was a director from at least as early as 1961 until at least 1969. He was also vice-president from 1966 through at least 1969, secretary from 1965 through 1966, and was still an officer in 1971. James F. Turner, Jr., was a director from at least as early as 1961 until December, 1970, when he was elected chairman of the board, a position he still holds. He was president from 1965 through December, 1970, and secretary from as early as 1944 until at least 1962. James F. Turner, III, is currently and has been a director since 1964. He was secretary/treasurer from 1966 through 1970, and has been president/treasurer since December, 1970.

11. The other two named members of the Trust Committee in this suit are Stuart Olivier and Louis B. Weller. Apparently neither one was served and neither filed an answer nor was represented at trial.

12. "The Committee may act at a meeting or by writing without a meeting, by the vote or assent of .a majority of its [five] members." Trust Agreement, Art. II, § 5.

13. Trust Agreement, Art. XI, § 1 (Emphasis added). The evidence also indicates that F&E is a relatively small company with 365 employees which is essentially run by members of the Turner family who it appears own a majority of the company's voting stock. See PX 9.

**964**

ing any attempts by the Commission to obtain voluntary compliance, they admittedly "wore many hats" within the company and were in a position, if they so desired, to take the necessary remedial steps to eliminate the discriminatory operation of the retirement plan. The Turners, in their capacities as Trust Committee members and as officers and/or directors of the company, could have amended, and in fact did in 1970 amend, the plan so as to equalize the vesting provisions between males and females.[14] Indeed, it is apparent from the above quoted provision of the Trust Agreement that it would have taken the concurring vote of both the company and the Trust Committee to amend the plan.

In a situation such as this where there is a substantial, if not complete, identity of parties before the EEOC and the court, it would require an unnecessarily technical and restrictive reading of 42 U.S.C. § 2000e–5 to hold that this court lacks jurisdiction over the members of the Trust Committee because they were not before the Commission in their capacity as such. McDonald v. American Federation of Musicians, 308 F.Supp. 664, 669 (N.D.Ill. 1970); Butler v. Local No. 4 and Local No. 269, Laborers' Internat'l Union, 308 F.Supp. 528, 531 (N.D.Ill.1969). This would not comport with the judicial policy of liberally construing Title VII. Tipler v. E. I. duPont de Nemours & Co., 443 F.2d 125, 131 (6th Cir. 1971); cf. Love v. Pullman, supra. The situation presented here involving a substantial identity between parties is distinguishable, in this court's view, from the line of cases, such as Mickel, where an agency relationship is sought to be established

by plaintiff, where none exists, as a basis for jurisdiction under 42 U.S.C. § 2000e–5.[15]

Mention should also be made at this point of Golden v. Kentile Floors, Inc., 52 F.R.D. 386 (N.D.Ga.1971), where an employee brought suit for nonpayment of certain profit sharing benefits against his former employer who administered the plan, the trustee-bank, and certain Trust Committee members. The Trust Agreement in that case was very similar to the one here insofar as operational control of the retirement plan is concerned. The plaintiff later voluntarily dismissed his cause of action against the Trust Committee members and proceeded against the remaining two defendants. The court denied motions to dismiss, holding that in view of the facts that all members of the Committee were in "close proximity" with the corporation and that the corporation exercised a large degree of control over the Committee, the Committee members were mere agents of the corporation and were not indispensable parties to the suit.

For the foregoing reasons, defendants' motion for a directed verdict as to the Trust Committee members is denied.

### Merits

Coming now to the merits of the cases, plaintiffs contend that the provisions of the pre-December, 1970, retirement plan, which differentiated between the sexes in terms of the vesting of benefits, constituted an unlawful employment practice within the meaning of 42 U.S.C. § 2000e–2(a)(1) which states:

"(a) It shall be an unlawful employment practice for an employer—

14. Vincent Chastang testified that James F. Turner, Jr., while president of the company, told him that it was a shame how much money Chastang was losing by retiring early and that he ought to sue to obtain it. Chastang quoted Turner as saying that it was "nothing out of his pocket" if Chastang sued, which apparently referred to the fact that the money which is paid into the plan by the company thereafter becomes the property of the beneficiaries (employees),

in essence, and is no longer the company's money. See Trust Agreement, Arts. IV, VII.

15. Although defendants have not raised the issue, it is appropriate to note that plaintiffs did not lose their standing to challenge the alleged discriminatory operation of the pension plan upon retiring from the company. Rosen v. Public Service Electric & Gas Co., 477 F.2d 90 (3rd Cir. 1973), aff'g, 328 F.Supp. 454 (D.N.J.1971).

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex,* or national origin. . . ." (Emphasis supplied).

Defendants maintain that the different treatment accorded males and females under the plan is "a bona fide occupational qualification reasonably necessary to the normal operation of [its] business" within the meaning of 42 U. S.C. § 2000e–2(e)(1) and is therefore not an unlawful employment practice. Specifically, defendants argue that the provisions favoring females were adopted for purposes of redressing the disadvantaged economic status of females relative to males in the foundry industry in general, and at F&E in particular, due to the physical nature of the work involved.

■ In an earlier opinion in this case the court held that pension plans are ordinarily part of the "compensation, terms, conditions, or privileges of employment" and therefore are covered by Title VII, 42 U.S.C. § 2000e–2(a)(1). Ugiansky v. Flynn & Emrich Co., 337 F.Supp. 807 (D.Md.1972), *citing,* Bartmess v. Drewrys U. S. A., Inc., 444 F.2d 1186, 1189 (7th Cir. 1971), cert. denied, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971). This is in accord with Rosen v. Public Service Electric & Gas Co., 477 F.2d 90 (3rd Cir. 1973), aff'g, 328 F.Supp. 454 (D.N.J.1971), and with the EEOC's Guidelines on Discrimination Because of Sex which states at 29 C.F.R. § 1604.9(f):

"It shall be an unlawful employment practice for an employer to have a pension or retirement plan which establishes different optional or compulsory retirement ages based on sex, or which differentiates in benefits on the basis of sex."

Such an administrative interpretation is entitled to "great deference." Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[16]

The EEOC guidelines further state that, "[t]he Commission believes that the bona fide occupational qualification exception as to sex should be interpreted narrowly." 29 C.F.R. § 1604.2(a). This interpretation has been followed by the courts. See, e. g., Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 387 (5th Cir. 1971), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); Rosenfeld v. Southern Pacific Co., 444 F.2d 1219, 1224 (9th Cir. 1971). The Fifth Circuit, dealing with sexual discrimination in hiring, observed in *Diaz:*

"We begin with the proposition that the use of the word 'necessary' in section 703(e) requires that we apply a business *necessity* test, not a business *convenience* test. That is to say, discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively." 442 F.2d at 388.

■■ The Fourth Circuit, discussing the general business necessity exception in the context of racial discrimination in a seniority system, stated the applicable law as follows:

"Collectively these cases conclusively establish that the applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the chal-

---

16. The fact that the guidelines were not promulgated until after these suits were filed is of no consequence since rights which came into being when the Act was passed are not abrogated by administrative interpretation. Rosen v. Public Service Electric & Gas Co., *supra;* Bartmess v. Drewrys U.S.A., Inc., *supra.*

lenged practice must effectively carry out ·the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact." Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971) (footnotes omitted), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

Four members of the five-justice majority of the Supreme Court in Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), recently held that governmental classifications based upon sex are inherently suspect and therefore must be subjected to close judicial scrutiny. Sexual classification may in the future be put in the same suspect category constitutionally as racial classification, irrespective of the fate of the proposed "Equal Rights" Amendment. This reinforces the view that the Fourth Circuit's comments on the business necessity exception in a racial context apply equally in a sexual context. The evidence adduced by defendants at trial to demonstrate business necessity for the unequal treatment of men and women under the retirement plan did not show sufficiently compelling reasons of business necessity to meet the test.

The retirement plan covered only the salaried employees of F&E. These persons represented a small fraction of the company's total employment of approximately 365 people and were primarily office workers. The manual laborers in the foundry were paid on an hourly wage scale and did not participate in the plan. The few males who worked in the foundry and were covered by the plan held supervisory positions and engaged in only a minimal amount of foundry work of the type that could be characterized as requiring a great deal of physical exertion. The females who participated in the plan were apparently all office workers who made relatively low salaries and generally had a higher turnover rate than males.

The defendants argue that the brute strength required of foundry workers made it impossible for women to compete for the higher paying jobs in the foundry. Therefore, so the defendants argue, the unequal vesting provisions of the retirement plan compensated women for the fact that they were relegated to the lower paying office and clerical jobs. But the fallacy of this argument is that the retirement plan did not cover the manual workers in the foundry, whether male or female. It is a *non sequitur* to justify a discriminatory practice as "necessary to the safe and efficient operation of the business" on the basis that male manual foundry workers earn more than female office workers when the males who are discriminated against under the retirement plan are not the manual foundry workers but the male supervisory and office personnel. This renders untenable defendants' argument that the vesting provisions of the plan favored females over males because the former could not perform heavy foundry work while the latter could.

In addition, the testimony revealed that during World War II when F&E did hire several women at relatively low wages to perform relatively light work in the core room of its foundry (in comparison to the higher wages for men performing heavier manual work), the women were paid an hourly wage and did not participate in the retirement plan.

Even if a desire to compensate women for their inability to perform the higher paying heavy manual jobs in the foundry were the reason for the discriminatory vesting provisions of the retirement plan, there is no evidence that such discriminatory compensation was "necessary to the safe and efficient operation of the business." 444 F.2d at 798. No evidence was produced that women could not be hired or retained for office work on a salaried basis unless they received the unequal pension plan benefits. No evidence was produced that women re-

quired the favored pension plan benefits to perform safely and efficiently their office and clerical duties for F&E.

On the reverse side of the coin, an ostensibly more compelling reason for the unequal vesting provisions of the plan was offered by James F. Turner, III, who testified that it allowed F&E to retain its male supervisory employees since they would be reluctant to leave the company with only 50% of their accrued benefits. This reason was perhaps of great significance during World War II when the plan was adopted and able-bodied males were at a premium. Here again, however, the test of Robinson v. Lorillard Corp., *supra,* requires more than this bare statement. No evidence was produced that this practice was *necessary* to the efficient operation of the business or that no other acceptable alternative method of inducing males to remain with F&E was available.

■ The evidence in this case demonstrates that women not only have held jobs in the foundry both at F&E and nationally, but that the males performing the heavy manual labor at F&E do not even participate in the retirement plan. After application of the appropriate legal principles to the facts of the case, the court finds that the F&E plan does not fall within the scope of the "bona fide occupational qualification" exception of 42 U.S.C. § 2000e–2(e)(1).

F&E still contends, however, that it is not liable for any acts of discrimination since it had no control over the pension plan and since both plaintiffs signed "certificates of eligibility"[17] pursuant to which they agreed not to sue the company in connection with the Trust Agreement in return for their being permitted to participate in the plan. This issue was raised by F&E through a motion for a directed verdict upon which the court reserved ruling.

■ The company's lack of control argument is without merit for two reasons. First, as discussed above, there was a substantial, if not complete, identity between the officers and directors of F&E and the Trust Committee members, and the company was, in fact, given the right, with the consent of a majority of the Trust Committee, to amend the plan.[18] Second, the definition of "employer" contained in 42 U.S.C. § 2000e(b) states:

> "The term 'employer' means a person engaged in an industry affecting commerce who has twenty-five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such a person.* . . ." (Emphasis added).

Under the facts of this case the Trust Committee during the relevant time period was the agent[19] or, in light of the other circumstances as well as the substantial identity of officers and directors and Trust Committee members, the alter ego of F&E. See Golden v. Kentile Floors, Inc., *supra.*

■ The release argument is similarly devoid of merit. The operative language of the release is:

> "I hereby agree that Flynn & Emrich Company of Baltimore City shall not in any way be subject to any suit or litigation for any cause or reason or thing whatsoever in connection with such trust or its operation, and I hereby release Flynn & Emrich Company of Baltimore City and its successors, from any and all such liability or obligation."

Chastang executed the document in 1946 and Ugiansky, in 1952. Both men

---

17. DX 1 and 2.

18. Trust Agreement, Art. XI, § 1.

19. An "agent" is defined in 2A C.J.S. Agency § 4(c) as:
"[O]ne who, by the authority of another, undertakes to transact some business or manage some affairs on account of such other, and to render an account of it. He is a substitute, or deputy, appointed by his principal primarily to bring about business relations between the latter and third persons."

reexecuted the release after July 2, 1965, the effective date of Title VII, in order to change beneficiaries under the plan.

■ F&E argues that the reexecution of the documents after the effective date of Title VII prevents plaintiffs from relying upon Title VII to sue the company since they were aware of the Act at the time they reexecuted the releases. The simple answer to this is that parties cannot agree to perform an illegal act. United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). A statutory right conferred upon a private party, but affecting the public interest may not be waived or released, if such waiver or release contravenes the statutory policy. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), aff'g sub nom., Dize v. Maddrix, 144 F.2d 584 (4th Cir. 1944). Virtually the same argument that F&E is making was made and rejected in *Rosen* where the defendant employer contended that the discriminatory pension plan was part of the negotiated collective bargaining agreement between it and the representatives of its employees. Rosen v. Public Service Electric & Gas Co., 328 F.Supp. at 464. See also Robinson v. Lorillard Corp., *supra,* 444 F.2d at 799. This is not to say that the release may be invalid as to suits brought against F&E in connection with the retirement plan by plaintiffs or other beneficiaries on other grounds. For the reasons stated, however, defendant F&E's motion for a directed verdict is denied.

Another issue raised in a motion for a directed verdict concerns the liability of defendant The Equitable Trust Company (ETC) as trustee for the discriminatory retirement plan. ETC contends that it is entitled to a directed verdict based upon its lack of discretion and control over the trust assets. The court reserved ruling on this motion along with the others at trial.

■ As previously discussed, ETC as trustee had very limited control over the administration of the retirement plan. Under Article X of the Trust Agreement its duties were confined to record keeping and investing the assets and paying out benefits in accordance with instructions given it by the Trust Committee. It was the Trust Committee who actually administered all phases of the retirement plan. In this respect, the case is indistinguishable from Golden v. Kentile Floors, Inc., 344 F.Supp. 807 (N.D.Ga.1972), wherein summary judgment was granted in favor of the nominal trustee-bank in a suit brought by an employee for nonpayment of certain profit sharing benefits against the trustee-bank and the employer, who administered the profit-sharing plan through a Profit-Sharing Committee. The reason the court granted summary judgment for the trustee in *Golden* was its lack of control over the administration of the trust.

In the cases here, it is apparent that ETC was a mere passive participant in the discrimination at the direction of the Trust Committee.[20]

For all of the foregoing reasons, the retirement plan as it existed prior to December 8, 1970, and after July 2, 1965, the effective date of Title VII of the Civil Rights Act of 1964, was in violation of Title VII and defendants F&E and the members of the Trust Committee (except Olivier and Weller who were not served) in their representative capacity are liable for said violation.

### Remedy

■ Although the damages portion of the trial in these cases has not yet been held, the court believes that the Third Circuit's decision in *Rosen* correctly states the applicable law. The relevant language of *Rosen,* substituting

---

20. PX 11, 13, 14, 15, and 16.

only the date of the revised F&E retirement plan in brackets, is as follows:

"Section 706(g) provides that the court 'may enjoin * * * and order such affirmative action as may be appropriate.' 42 U.S.C. § 2000e–5(g). 'This grant of authority should be broadly read and applied so as to effectively terminate the practice and make the victims whole.' Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (C.A.7, 1969). The relief is intended to restore those wronged to their rightful economic status absent the effects of the unlawful discrimination. Robinson v. Lorillard Corp., 444 F.2d 791 (C.A.4), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). We are under a duty to render relief which will eliminate the 'discriminatory effects of the past as well as bar like discrimination in the future.' Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965); see Smith v. Young Men's Christian Association, 462 F.2d 634 (C.A.5, 1972).

"Male employees did retire early under . . . the pension plan. These men now receive reduced pensions whereas women who retired early under identical circumstances receive full benefits. The effective date of Title VII of the Civil Rights Act of 1964 was July 2, 1965. Men who have retired since that date with annuities reduced below those which they would have received had they been women *must be compensated for the losses they sustained . . . due to the discriminatory reduction in the amount of pensions on account of service prior to* [December 8, 1970], *the effective date of the revised retirement plan, and after the effective date of the Act.* Further, since we are of the view that the pension rights of active women employees which accrue before [December 8, 1970], cannot be diminished, we hold that the retirement credit of males similarly situated must be increased for the relevant period between July 2, 1965, and [December 8, 1970]. This must be done to cure the effects of discrimination since the effective date of the Act." 477 F.2d at 95–96 (Footnotes omitted) (Emphasis supplied).

What this language means for purposes of these cases is that plaintiffs are entitled to receive full benefits from the retirement plan, earned through their employment period between the effective date of Title VII and the effective dates of their respective retirements,[21] which occurred prior to the December 8, 1970, amendment to the plan. Evidence will, of course, have to be taken on the precise amount of benefits due each plaintiff unless this can be stipulated by the parties.

The foregoing constitutes findings of fact and conclusions of law in accordance with Rule 52, F.R.Civ.P.

The court concludes that a master should be appointed, pursuant to Rule 53, F.R.Civ.P., to hear evidence on and compute the damages to which the plaintiffs are entitled.

## MEMORANDUM AND ORDER

These companion cases, which were consolidated for trial, are premised upon what the court has now found to be a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., with respect to the noncontributory retirement plan of Flynn and Emrich Company. Plaintiffs are two retired male employees of Flynn and Emrich who were discriminated against on the basis of sex in violation of Title VII because female employees were entitled to retire earlier and receive greater retirement benefits than male employees similarly situated. For a more complete statement

21. As the court indicated in an earlier opinion in this case, there is apparently some disagreement between the parties as to the effective dates of plaintiffs' retirements. Ugiansky v. Flynn & Emrich Co., *supra*, 337 F.Supp. at 808–809, n. 4. However, since a relatively small sum of money is involved between the disputed retirement dates, perhaps precise dates can be stipulated for purposes of computing damages.

of the pertinent facts, reference is made to this court's opinion herein of August 14, 1973.

Plaintiffs have moved for a "New Trial" in these consolidated cases on the principal basis that the court has denied them a trial on the issue of damages. Actually the court accepted, in lieu of a referral of the issue to a master, a stipulation of counsel in reference to the calculation of damages based upon a legal standard which the court enunciated in the aforesaid opinion for the determination of the damages. Upon reflection, however, the court is persuaded that it may have adopted an incorrect standard for the determination of damages.

■■■ The court is convinced that a recovery under Title VII cannot be allowed for alleged illegal discriminatory events which occurred before the effective date of the Act which made those discriminatory events illegal. In this case, however, it is possible factually that a full recovery by the plaintiffs of their entire accrued interest in the pension would not be violative of that legal precept. On the other hand, a different potential factual situation could result in an effect being given to Title VII retroactive to its effective date of January 2, 1965.

For instance, the actuarial computations upon which the amounts of pensions were paid prior to January 2, 1965, may have been based in part upon the predicted amounts of money which the pension fund would have available for investment, reinvestment and other purposes due solely to early retirement by males with a consequent forfeiture to the fund of 50% of the benefits they could have received if they had been females. Under such a factual circumstance, allowance of recovery by a plaintiff, upon his early retirement after the effective date of Title VII, of full benefits based upon his period of employment prior to the effective date of Title VII would either bankrupt the pension fund, require the pensioners to accept a lesser pension based upon a new actuarial calculation, or require an infusion of new capital from some source even

though the original actuarial calculation was based upon a legally permissible discriminatory system when made and subsequently legally relied upon until January 2, 1965. Such a result would clearly be a retroactive application of Title VII to events prior to its effective date. Under this set of facts, the measure of damages as set out in my opinion of August 14, 1973, would be the correct one.

On the other hand, it is possible that the actuarial computations and basis upon which the Flynn and Emrich retirement plan was operated prior to January 2, 1965, did not take into account in establishing the rates of pension payments or other benefits the anticipated male early retirement forfeitures. If, in fact, each male employee earned by his service with Flynn and Emrich for each year worked prior to January 2, 1965, a certain monetary interest in the retirement fund that became absolutely vested after 11 years' service provided he did not retire early, and if further, any forfeited interest due to the early retirement of a male after 11 years' service was simply a windfall to the fund at the time of the forfeiture, rather than an event which had been actuarily anticipated in previous years, then the effect of a disallowance of the forfeiture would be prospective only. If prospective only, then, of course, the elimination of the discriminatory forfeiture provision by operation of law through Title VII on January 2, 1965, and a forced payment after January 2, 1965, to a male early retiree of the remaining portion of his otherwise nonforfeitable interest in the fund would not result in giving a retroactive effect to Title VII. Under this set of facts, the measure of damages as set out in my previous opinion would be an incorrect one.

In my opinion of August 14, 1973, I did not attempt to deal with the issue of counsel fees or interest for the simple reason that the case was to be referred to a master for calculation of the damages in the absence of a stipulation. The parties did subsequently stipulate to a calculation of damages based upon

the measure of damages set forth in the aforesaid opinion, and a form of judgment order was presented based thereon with the consent of counsel for all parties. At that time no request was made by plaintiffs' counsel in reference to an award of counsel fees or interest. However, in view of the fact that the court has determined to vacate its judgment order in these consolidated cases to allow factual findings to be made in accordance with this memorandum, the court will at an appropriate later date allow counsel to argue their respective positions in reference to the propriety of and the amount of any award of counsel fees and interest.

For the reasons set forth herein, it is this 26th day of October, 1973, by the United States District Court for the District of Maryland,

Ordered that the judgments entered in Civil Action No. 71–593–M and Civil Action No. 71–652–M on September 24, 1973, against defendant Flynn and Emrich Company, and Charles T. Turner, James F. Turner, Jr., and James F. Turner, III, be, and they are hereby, vacated and set aside; and it is further

Ordered that this matter be scheduled for further proceedings consistent with this memorandum opinion in due course.