A. Clay AARON, Jr. and Fletcher A. Wynn, Plaintiffs,

v.

Chief Jack DAVIS et al., Defendants,

v.

John J. UEKMAN, and International Association of Firefighters, Local 34, Intervenors.

No. LR–76–C–16.

United States District Court, E. D. Arkansas, W. D.

May 28, 1976.

Philip K. Lyon, J. Bruce Cross, House, Holmes & Jewell, Little Rock, Ark., for plaintiffs.

Joseph C. Kemp, Kemp & Henry, Little Rock, Ark., for defendants.

Philip E. Kaplan, Walker, Kaplan & Mays, Little Rock, Ark., for intervenors.

## MEMORANDUM

EISELE, Chief Judge.

On December 17, 1975, Chief Jack Davis sent separate letters to Assistant Fire Chief A. Clay Aaron, Jr., and District Chief Fletcher A. Wynn advising them that their services with the Little Rock Fire Department would be terminated effective January 16, 1976. He indicated that the notification was being issued pursuant to the requirements of Section 13–11 of the Ordinances of the City of Little Rock. That section, which was enacted on June 2, 1958, provides:

"Retirement from active employment for all members, including department heads, of the fire department, shall be mandatory upon attaining the age of sixty-two years; provided, however, such retirement shall not be mandatory for members now employed by the fire department until such time as such employee, by reason of length of service, is eligible for retirement. (Ord. No. 10804, § 1, 6–2–58)."

On September 21, 1970, another ordinance, Section 34–7, was enacted which provides:

"(a) No employee of the city, either uniformed or nonuniformed, shall be entitled to continue in such employment beyond his or her sixty-fifth (65th) birthday. Provided, however, the city manager may, where the need for the particular services of a given employee is critical to the city, grant an extension for continued employment for as much as one year at a time but in no case shall such employee be allowed full-time employment beyond his or her seventieth (70th) birthday. Provided further, in no instance shall retirement benefits as provided by section 2–24 of the Code of Ordinances accrue to an employee based on disability occurring past his or her sixty-fifth (65th) birthday."

As interpreted and applied by the City, Section 34–7 covers all employees of the City of Little Rock except members of the fire department. Policemen may, therefore, continue in employment to age 65 and even beyond, if extensions are granted, but members of the fire department may not continue active employment beyond age 62.

Apparently prior to 1958 there was no mandatory retirement ordinance affecting city employees. Furthermore, the chief of the fire department assumed that the 1970 ordinance, Section 34–7 superseded the 1958 ordinance, Section 13–11, and, therefore, from 1970 until December 17, 1975, he administered the firemen's retirement program on the assumption that the personnel of that department could continue to work until age 65. On December 17, 1975, however, he was advised by the personnel department that the legal staff was of the opinion that Section 13–11 controlled as far as employees of the fire department were concerned. Both Assistant Fire Chief Aar-

on and District Chief Wynn had attained the age of 62 prior to January 16, 1976.

By their amended complaint filed herein, the plaintiffs seek actual and punitive damages, reinstatement with back pay, and injunctive and equitable relief on the basis of: (1) 29 U.S.C. § 621, et seq., the "Age Discrimination Act of 1967" as amended; (2) 42 U.S.C. § 1983; and (3) the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution. They contend, inter alia, that ordinance Section 13–11 is in direct conflict with the Age Discrimination Act of 1967 as amended; violates the provisions of 42 U.S.C. § 1983; and constitutes a denial of due process and equal protection. Their amended complaint alleges that the mandatory retirement age of 62 for firemen has no rational basis and that the attempted separate classification of firemen for retirement purposes is irrational, arbitrary, capricious, and wholly lacking any justifiable business necessity. With respect to their equal protection arguments, plaintiffs particularly emphasize that there is no basis in fact for treating the retirement of policemen differently from that for firemen.

The defendants are Chief Jack Davis, head of the Little Rock Fire Department, and the individual members of the City Board of Directors for the City of Little Rock.

At a preliminary hearing on plaintiffs' application for relief pendente lite, Mr. John J. Uekman, a member of the Little Rock Fire Department and the president of Local 34 of the International Association of Firefighters, and the Association itself, asked leave to intervene, pointing out that Local 34 is a labor organization which represents the employees of the Little Rock Fire Department in negotiations with the City of Little Rock concerning terms and conditions of employment and that such local has a substantial historic and continuing interest in city ordinances which affect the health, safety and welfare of its members. The motion to intervene alleges that Section 13–11 of the Code of Ordinances, which is under attack by plaintiffs, "is in

the best interests of the members of I.A.F. Local 34 and its enactment and enforcement was and is supported by I.A.F. Local 34." The motion to intervene was granted.

By further amendment to their complaint filed March 23, 1976, plaintiffs alleged that they had discharged the jurisdictional requirements under the Age Discrimination Act and had received a "right to sue" notification letter from the Department of Labor. A copy of the letter was attached to the amendment.

The case was tried to the court on May 3 and 4, 1976.

*Findings of Fact*

Assistant Fire Chief A. Clay Aaron, Jr., was born on December 1, 1913. He has been a member of the Little Rock Fire Department for almost 36 years. He progressed through the ranks from hoseman, assistant mechanic, driver, captain, district chief, to assistant fire chief. As assistant chief he was the second in command in the department. District Chief Fletcher A. Wynn was born February 8, 1913. He has been an employee of the department for approximately 34 years, and he, too, progressed through the ranks from hoseman, driver, captain, to district chief.

As assistant fire chief, Mr. Aaron's duties are primarily of a supervisory nature. He worked what was "supposed to be" a 40-hour week. Routinely he would arrive at his office around 6:45 a.m. For the next 45 minutes to an hour he would relieve the district chiefs and make any "runs" for them that might be required during that time period. Then he would work in his office checking the daily work rosters, seeking replacements for personnel who were ill, and attending to equipment repair notices. He would also check the alarm office and review the daily "runs". He would occasionally visit stations and attend to building repair problems. He would confer regularly with Chief Davis.

There is somewhat of a tradition within the fire department that all personnel from top to bottom actively participate in the

fire fight when required by an appropriate alarm to be at the fire site. Although there is some substance to the notion, still it is quite clear that the duties and responsibilities of those in the higher ranks differ materially from those of lower echelon personnel. Assistant Fire Chief Aaron, for instance, would make most "second alarm" fires and also fires of a certain category, such as those at hospitals and nursing homes. During the course of a typical week, he would average two or three "runs". And, when at a fire, all personnel, from the lowest to the highest, do not perform essentially the same duties. As one might suspect, the highest officer at the scene is generally in charge. His main function is to coordinate the effective and efficient use of personnel and equipment at the scene. It is, however, quite true that all personnel of the Little Rock Fire Department from the chief on down make it a practice to actively participate in the fire fight, alongside other personnel, when their supervisory duties permit. As assistant fire chief, Mr. Aaron went into many fires although not required to do so by virtue of his status and rank.

From all the evidence it is clear that Mr. Aaron's duties and responsibilities as assistant fire chief were primarily in the areas of supervision, discipline, communication and training, together with personnel and equipment evaluation and coordination.

At the time of his forced "retirement" Assistant Fire Chief Aaron was earning $1,521.00 per month. His pension would amount to $810.50 per month.

Mr. Aaron considers himself to be in the best of physical condition. He states that he has just recently had a physical examination which verifies that opinion. The Court finds that he is, indeed, in good physical condition. There is nothing in the record to indicate that he is in any way unable to continue to fully and capably discharge the duties of assistant fire chief if permitted to do so.

The fire department has divided the city of Little Rock into four districts. District Chief Fletcher Wynn, one of the plaintiffs, was in charge of one of the four districts. As such, he had several companies and stations under his command. District Chief Wynn would work 24 hours, then be off 48 hours, although, like other personnel, he was "on call" for emergency situations at all times. His duties were principally of a supervisory nature. On arriving at the station he would check the rosters and report to the assistant chief. He also would check for mechanical troubles and report repair and fuel requirements. It was his practice to "run" all general alarm fires within his district and also most "second alarm" fires. He would usually average five alarms during his 24-hour period. When at the scene of the fire he would first check with his captains and determine what the problems were, and then he would direct and coordinate the use of personnel and equipment so long as he was the senior officer at the site. He, too, testified that while he was not required to go into a fire, he frequently did so. His attitude was that he would do whatever was required by the situation.

Chief Wynn testified that he felt that his physical condition was good and that he had no problem at all handling the equipment when he actually went into a fire. There is nothing in the record to indicate that he was unable to continue to discharge fully the duties of district chief after January 16, 1976, if he were permitted to continue his employment.

The defendants and the intervenors make the point that fire fighting is among the most hazardous of all occupations. The Court, after hearing the evidence, finds this to be so. The defendants and the intervenors further suggested that the problems and the risks of the fire fighter in Little Rock were not substantially different from those of fire fighters in smaller cities or large metropolitan areas. On the basis of the evidence, the Court disagrees with this proposition. Although fire fighting appears to be a relatively hazardous occupation regardless of the local circumstances, still those local circumstances can materially alter the degree of the hazard and the risks involved. The testimony makes it

clear that each fire is different and that the risks involved turn in part on the nature of the fire. Chief Jack Davis testified that he would not want to work as a fireman in Houston, Texas, because of the greater risks involved. He pointed out the large number and types of petroleum and chemical installations that create peculiar, dangerous and difficult problems. Furthermore, the existence of a large number of high-rise buildings, particularly of the "skyscraper" type, creates very special and complicated problems. Little Rock has many buildings that are above the reach of the ladder equipment (approximately nine floors) but the tallest building is thirty stories, and there are probably not more than a half dozen that are in excess of twelve stories.

The risks of injury, employment-related disease, and death in the fire fighting occupation depend upon a great variety of circumstances, including but not limited to the number and quality of personnel available; physical and mental requirements; training and experience; equipment; the peculiar nature of residential, commercial and industrial structures in the area; fire prevention and inspection programs; climate and weather; leadership; and pure luck. The defendants and intervenors introduced certain statistical information tending to show that fire fighting was *the* most hazardous occupation on a national basis, followed by mining, construction, agriculture, and police work. The data indicated that in 1974 there were 84 accidental deaths per 100,000 fire fighting workers as compared, for instance, with 51 accidental deaths per 100,000 police workers. The graphs for the period 1967 through 1974 consistently show a greater number of deaths among fire fighters than among police officers in the line of duty. Statistical data comparing injuries and deaths of Little Rock policemen with those of Little Rock firemen, however, tend to a contrary conclusion: to wit, that there is a greater risk of death or injury to a policeman in Little Rock than to a fireman. The evidence to compare the risks and hazards of the two occupations did not establish much more than that the pursuit of both occupations expose personnel to substantial, though generally different, hazards and risks.

To be hired at the entry level of the fire department, one must be at least 21 and not over 31 years of age. Each rookie serves a probationary period of 12 months from actual date of employment; thereafter, and until age 62, he can only be discharged for cause. If, prior to age 62, he is so discharged, he is entitled to a hearing before the Civil Service Commission and thereafter in the state courts.

Under the retirement system presently in effect, an employee of the fire department may retire after twenty years of service at 50 percent of his salary at the time he takes retirement. He can add $5.00 per month to his retirement for each additional year that he works beyond twenty but not to exceed an additional five years.

Although certain risks and hazards to fire fighters have increased over the past several decades by the development of new chemicals, plastics and industrial processes, overall the risks and hazards have been somewhat reduced by the development of better equipment, information and training. The wide distribution of self-contained breathing apparatuses has contributed much to the safety of fire fighters. Likewise, new and lighter, but more protective, clothing (including helmets and footwear) has reduced injury and death. The older clothing required to be worn by practically every fireman has a dry weight of approximately 33 lbs. The larger self-contained breathing "airpack" weighs in the neighborhood of 22 lbs. And, of course, firemen are called upon to carry axes, ropes, ladders, hoses and other equipment. It is obvious that the physical requirements, alone, are great. The psychological and emotional demands must also be considered. The first few minutes of a fire may be more critical than the following hours, and it is therefore important that fire fighting personnel respond very quickly to an alarm. Some tests have been conducted which indicate that it is not unusual for a fireman's pulse rate to jump from 70 to 180 or even 200 within

moments after an alarm is sounded. Many fires put an extraordinary demand upon the physical endurance and stamina of fire fighters. Heat stroke and heat exhaustion are major problems.

In general, fire fighting puts serious and unusual demands upon the cardiovascular system, the pulmonary system, and the musculoskeletal system. Despite this, all of the evidence tends to indicate that the younger fire fighter, even on a percentage basis, is more likely to suffer injury or death than the older, more experienced fire fighter. The judgment, knowledge, awareness, and experience of the older personnel appear to offset certain decrements in overall physical condition.

With respect to the two plaintiffs, the evidence is uncontradicted that they were able to handle the physical and psychological demands imposed on the lowest level fire fighter, although they were not called upon to meet such demands as often as such lower echelon firemen.

The Court was impressed with the testimony of Dr. Conrad from St. Louis. He decried the lack of empirical data and statistical information which might help one to answer some of the questions which the parties to this lawsuit are presently only speculating about. He indicated that many studies are under way, or in the offing, which should help resolve some of the questions concerning the effect of the aging process upon the ability to perform the functions and duties of fire fighters. At this point in time, however, it appears that we are left largely with ideas derived from stereotyping, preconceived notions, intuition, and uninformed judgments.

Dr. Conrad emphasized strongly his opinion that better training and a higher degree of professionalism would reduce considerably the instance of injury and death in the fire fighting profession. As an example, he discussed the problem of heat exhaustion and pointed out that better leadership at the fire fight, the availability of relief crews, the monitoring of the condition of personnel, the making available of liquids and salt, and the conditioning of personnel to withstand heat could dramatically reduce the incidence of this particular hazard.

Chief Jack Davis essentially supported the claim of the plaintiffs that they are still fully capable of performing all duties required of them even though they have both passed their 62nd birthdays. Chief Davis, after years in the fire fighting profession, was of the opinion that an effective fire department required, in addition to certain minimum standards of physical strength and stamina, the enthusiasm of youth and the experience and judgment of older personnel. According to him, a proper mix of these ingredients would inure to the benefit of the public.

In the chief's view, it is not just fortuitous that the older, more experienced fire fighters are less likely to be injured or killed. After years of experience, a fire fighter can judge when the water load on one floor is likely to bring about its collapse; he can judge when a wall is about to fall; he can anticipate the presence of noxious fumes and the possibility of explosion; and, having this ability, he can use it for the benefit of the younger and less experienced personnel by warning them of the risks and hazards involved in the particular fire fighting situation.

Chief Davis agrees with everyone else that fire fighting requires great physical stamina, but he also observed, on the basis of his actual experience, that chronological and functional age are seldom the same. In his opinion, some younger members of the fire department should be retired because of physical inability to do the job. Such personnel may be in their late 40's or early 50's. On the other hand, many men past the age of 62 are strong and active physically and fully able to perform the tasks required of the lowest echelon fire fighter. The Court credits these views in the absence of any evidence to the contrary.

The Little Rock Fire Department has approximately 300 employees. According to national standards it is understaffed. It has nevertheless a relatively good safety record. It does not have all of the equipment that it needs. It does not have all the

best, the most modern, or the most effective equipment. In other words, it faces the same budgetary and financial limitations that restrict other fire departments. The testimony leaves the Court with the impression that the Little Rock Fire Department is rather "average" in terms of resources.

The evidence shows that the retirement age for firemen in North Little Rock is 65 and, further, that extensions may be granted beyond that age. In Shreveport, Louisiana, the retirement age is 62. The testimony of Mr. Leonard Peters, the vice-president of District 14 of the IFA, indicates that the law creating that retirement age, like Ordinance 13–11, was enacted primarily as the result of, in effect, collective bargaining. The union wanted the earlier retirement date. In Shreveport the situation developed where firemen were staying on until nearly 70 years of age and simply would not retire voluntarily because of the low retirement benefits. A "package deal" was decided upon pursuant to which retirement benefits were raised from 50 percent to 75 percent of the fireman's pay on the date of retirement, and, at the same time, the mandatory retirement age was set at 62. So both the Shreveport and the Little Rock age requirements arose out of collective bargaining and political agreements. Neither were preceded by, or based upon, actual studies or empirical data indicating the relevance of the age 62 to the occupational requirements as compared with, say, age 65.

*Conclusions of Law*

Plaintiffs have asserted constitutional claims pursuant to the due process and equal protection guarantees of the United States Constitution and 42 U.S.C. § 1983. Taken together, these contentions are, in essence, that mandatory retirement at age 62 for firemen, as required by ordinance Section 13–11, lacks a rational basis in fact and that an attempt to classify firemen separately from other city personnel, especially policemen, for retirement purposes is irrational, arbitrary and capricious.

Plaintiffs' due process and equal protection arguments raise interesting constitutional questions relating to public employment. The principal issue appears to be to what extent, if any, there exists a protectable state interest in the city's selection of 62 years as a retirement age for firemen where, as in this case, there is an absence of empirical data pointing to the preferability of any particular age within the given range with which we are dealing. The Court, however, need not reach the constitutional questions premised by plaintiffs' arguments, having determined that the statutory provisions of the Age Discrimination in Employment Act of 1967, as amended, are dispositive of this case.

In general, the federal age discrimination act prohibits age discrimination in employment affecting interstate commerce with respect to persons between the ages of 40 to 65 years. Specifically, section 623(a)(1) of Title 29, United States Code, provides in pertinent part that, "It shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age."

Plaintiffs have clearly established a *prima facie* case of discrimination under the Act. Intervenors and defendants (hereinafter defendants) have not contested that plaintiffs are among the class of persons now covered by the statute. Nor have the defendants, in any serious manner, contested the fact that plaintiffs were capable of satisfactorily performing their respective jobs at the time of their dismissal. That the dismissals occasioned by the ordinance were involuntary on plaintiffs' part was conceded in the pleadings. Therefore, the only issue left for consideration is whether defendants have produced evidence sufficient to establish a statutory defense to the Act's proscriptions.

Defendants' sole defense rests upon their contention that the city's mandatory retirement ordinance qualifies as a statutory exemption under the provisions of section 623(f)(1) of the Act. That provision provides that, "It shall *not* be unlawful for an employer to [discharge an employee because

of such individual's age] where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business."

Defendants argue that mandatory requirement for firemen in Little Rock at age 62 is based on considerations of public safety and that such retirement age therefore constitutes a bona fide occupational qualification necessary to the normal operation of the fire fighting "business." Moreover, defendants take the position that the economic and human risks involved in retaining an unqualified fireman are such that the defendants need only demonstrate that they have a rational basis in fact to believe that the elimination of the mandatory retirement provision would increase the likelihood of risk of harm to the public or to other firemen.

█ A review of the federal regulations (promulgated by the United States Department of Labor pursuant to the Act) and the available case law reveals that it is the nature of the task and the risks to fellow personnel and the public inherent in any inability to adequately perform that task which defines the burden incumbent upon the employer who is attempting to establish the bona fide occupational qualification exemption under the statute. 29 C.F.R. § 860.102(d) provides the following general illustration of a possible bona fide occupational qualification: "Federal statutory and regulatory requirements which provide . . . compulsory retirement, without reference to the individual's actual physical condition at the terminal age, when such conditions are clearly imposed for the safety and convenience of the public." A specific example cited in the regulations under this illustration is a Federal Aviation Agency regulation which does not permit airline pilots to engage in carrier operations as pilots after they reach age 60.

█ It is apparent that the quantum of the showing required of the employer is inversely proportional to the degree and unavoidability of the risk to the public or fellow employees inherent in the requirements and duties of the particular job.

Stated another way, where the degree of such risks is high and methods of avoiding same (alternative to the method of a mandatory retirement age) are inadequate or unsure, then the more arbitrary may be the fixing of the mandatory retirement age. But at no point will the law permit, within the age bracket designated by the statute, the fixing of a mandatory retirement age based entirely on hunch, intuition, or stereotyping, i. e., without *any* empirical justification.

█ Generally, it is the relative ease with which possibly incapacitating defects are detectable that determines whether the qualifications imposed by the employer are job-related or "reasonably necessary to the normal operation of the particular business," as provided in the Act. In this area, a claim for exemption from the statute's proscriptions will not be permitted on the basis of the employer's stereotyping assumption that most, or even many, employees in a particular type of job become physically unable to perform the duties of that job after reaching a certain age. *See Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969).

In support of their contention that defendants need only demonstrate that they have a rational basis in fact to believe that the elimination of mandatory provisions would increase the stated risks of harm, the defendants have cited to the Court the case of *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859 (7th Cir. 1974). In *Greyhound*, the Seventh Circuit Court of Appeals was confronted with the refusal of an intercity bus carrier to consider employment applications for the position of bus driver from individuals 35 years of age or older. The district court determined that the carrier's maximum hiring age policy violated the federal age discrimination act principally upon the grounds that Greyhound had failed to sustain its burden of proof in establishing the bona fide occupational qualification exemption by its failure to demonstrate that all or substantially all individuals over the age of forty years would be unable to perform safely and efficiently the duties of bus driv-

ers. *Hodgson v. Greyhound Lines, Inc.*, 354 F.Supp. 230 (N.D.Ill.1973). The district court's rationale with regards to the standard of proof was essentially that employed by the Fifth Circuit in *Weeks v. Southern Bell Telephone & Telegraph Co., supra.* The Seventh Circuit, however, reversed the district court judgment and rejected its rationale on the standard of proof stating, "In *Weeks*, the Fifth Circuit was not confronted with a situation where the lives of numerous persons are completely dependent upon the capabilities of the job applicant." 499 F.2d at 861, 862. In analyzing the standard of proof required of Greyhound, the appellate court emphatically stressed the compelling concerns of safety which burden a public transportation carrier entrusted with the lives and well-being of passengers. Concomitantly, the Seventh Circuit ruled that Greyhound need only "demonstrate that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers." 499 F.2d at 863. *See Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972).

■ This Court finds no necessity to agree or disagree with the analysis of the Seventh Circuit in *Greyhound* since, accepting that ruling on the basis of the facts assumed in the Circuit Court's opinion, it is nevertheless quite clear that the standards there applied would not control upon the facts presented here. Whether occupational qualifications are to be deemed "bona fide" and "reasonably necessary to the normal operation of the particular business" should be determined on the pertinent facts surrounding each particular situation. *See* 29 C.F.R. § 860.120(b).

Although considerations of public safety are involved in both the *Greyhound* case and the instant case, this Court finds and concludes that the nature of that concern differs in the two situations both in kind and degree; further, the Court concludes that there are a myriad of other factors and circumstances, as discussed *supra*, which distinguish this case from *Greyhound*. It is of considerable importance that the risks

inherent in the two situations are markedly different. The risk is far greater that a slight error in judgment, or a slight physical defect, in a person who is piloting a jetliner or driving a bus would produce "magnified" tragic results than they would in the case of one participating in a joint effort to extinguish a fire. A contrast of the two cases further reveals that the degenerative physical and sensory changes mentioned in *Greyhound* (which would result in the impairment of driving ability) are more subtle and not as readily detectable by physical examination as are the physical and mental changes mentioned by Dr. Conrad in the instant case which he felt might impair the performance of firemen.

Moreover, the Court is of the opinion that it makes little difference in the result here whether one adopts and applies the *Greyhound* or the *Weeks* rule. Defendants have attempted to establish that fire fighting in general is among the most hazardous of occupations, and the Court has acknowledged that this may be so on a national basis. The defendants have also expressed concern about the risks to the public and to the younger members of the fire department if the mandatory age requirement is not upheld, but they have made no real showing of such risks relative to the retention of firemen between the ages of 62 and 65 in the Little Rock Fire Department. As indicated by the testimony of Dr. Conrad, the defendants have attempted to support this ordinance upon the basis of stereotyping—upon the assumption that the older person cannot "cut the mustard." Needless to say, the trial did not produce any evidence which tends to support the proposition that all, substantially all, most or even a substantial number of individuals between the ages of 62 and 65 are not, or would not be, because of their age capable of performing the duties required of Little Rock fire fighters.

■ Of course, the Court can take judicial notice, and the testimony also made it obvious that, regardless of individual differences, the aging process proceeds inexorably and takes its toll along the way. But,

 

in the age bracket with which we are here concerned—62 to 65—there is no suggestion that the legitimate apprehension of the defendants cannot be met through periodic physical examinations, especially if those physical examinations are designed to include appropriate tests of the cardiovascular and pulmonary systems both at rest and under stress. It may well be that scientific and medical research and studies currently under way, or in the offing, may provide empirical data showing, statistically at least, the inability of a large percentage of this age group to adequately perform such duties. If such empirical data went far enough, it might, indeed, form a factual basis for lowering the mandatory retirement age from 65, since then it could be urged that such data establishes such lower age as a bona fide occupational qualification reasonably necessary to operate the fire department. On the present record, however, there is nothing to show the special relevance of the age 62 mandatory retirement requirement, and, therefore, the provisions of Section 13–11 can only be deemed arbitrary and capricious and wholly lacking in any justifiable business necessity.

■ Plaintiffs have requested punitive damages, as well as actual damages, reinstatement, back pay, and injunctive and equitable relief. In accordance with the foregoing, plaintiffs will be granted reinstatement, back pay to January 16, 1976, and an injunction restraining the individual members of the Board of Directors of the City of Little Rock and Fire Chief Jack Davis from dismissing plaintiffs solely because of the provisions of Ordinance § 13–11, at least until such time as age 62 or some other age under 65 is properly validated as a bona fide occupational qualification for such jobs. The Court will, however, refrain from granting plaintiffs punitive damages, finding no evidence to indicate that defendants have acted in bad faith.

Plaintiffs will prepare a precedent for an order granting judgment in their favor in accordance with the Court's ruling and forward the precedent to the defendants and intervenors for approval as to form prior to submitting same to the Court.