**UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**CITY OF SAINT PAUL and State of Minnesota, Defendants,**

and

**Uniformed Fire Fighters of Saint Paul, Local 21, and James Fee, Intervenors.**

**No. 3–79 Civ. 630.**

United States District Court,
D. Minnesota,
Third Division.

Sept. 9, 1980.

---

Isaias Ortiz, Nelson G. Alston, and Rose Marie Baron, Milwaukee, Wis., for plaintiff.

Terry Sullivan, Saint Paul, Minn., for defendant City of Saint Paul.

Merwin Peterson, Asst. Atty. Gen., Saint Paul, Minn., for defendant State of Minn.

Foster, Jensen & Short by Brian P. Short, Minneapolis, Minn., for intervenors.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

ALSOP, District Judge.

The above-entitled action came on for trial before the court on May 19, 1980, and trial was conducted on May 19, 20, 21, 22, and June 10, 11, and 12, 1980.

All evidence having been taken and the hearings having been closed, and based upon the records, files, pleadings, exhibits and testimony, the court makes the following:

## FINDINGS OF FACT

*Nature of the Action.*

1. This is an action brought pursuant to the provisions of 29 U.S.C. § 621, *et seq.*, the "Age Discrimination in Employment Act" ["the Act"]. Certain mandatory retirement provisions established by state law and city ordinance for fire fighters employed by the City of St. Paul have been challenged as violating the terms of the Act.

2. The state law in question is codified as *Minn.Stat.* § 423.075, Subd. 1 (1980). That statute provides in pertinent part:

Every employee, officer, or person on the payroll of any fire or police department in any city of the first class who is designated as a future beneficiary by the rules of any tax aided pension, relief, or retirement fund established and maintained by the authority of laws of this state, shall retire upon reaching the age of 65 years . . . .

The City of St. Paul is a first class city and participates in the state–administered pension program. However, the State of Minnesota neither intends nor threatens to enforce this statute.

3. The challenged city ordinance is St. Paul Ordinance No. 16591, enacted October 18, 1979, which provides in pertinent part:

A mandatory retirement age of 65 for all uniformed fire employees is hereby established . . . . This act requires that all employees in the uniformed fire division must retire on the first day of the month immediately following the month in which the employee reaches age 65.

The effective date of this ordinance was December 26, 1979. The City of St. Paul intends and has threatened to enforce this ordinance.

4. The Act, 29 U.S.C. §§ 623 and 631 (1980), prohibits discrimination in the employment of persons between 40 and 70 years of age. It also provides:

It shall not be unlawful for an employer . . . to take any action otherwise prohibited under [the Act] where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business . . . . [29 U.S.C. § 623(f)(1).]

The issue for decision in this matter is whether age is a bona fide occupational qualification reasonably necessary to the normal operation of the St. Paul Fire Department.

*Parties.*

5. Plaintiff herein is the United States Equal Opportunity Commission, the agency of the United States Government charged with administration and enforcement of the Act. This action was commenced by plaintiff on behalf of "charging party" George Schmidt, a District Fire Chief ["District Chief"] of the St. Paul Fire Department ["the Department"], who was born on April 18, 1914. Individuals holding the rank of

District Chief are members of the uniformed division of the Department and, at the time this action was commenced, District Chief Schmidt had reached the age of 65 years. Defendant City of St. Paul acknowledges that Mr. Schmidt has performed his duties as District Chief satisfactorily.

6. Defendant State of Minnesota is alleged by plaintiff to be responsible for the administration and enforcement of *Minn. Stat.* § 423.075 (1980).

7. Defendant City of St. Paul is a political subdivision of the State of Minnesota and for purposes of this lawsuit is a fire fighting agency which employs more than 20 persons.

8. Intervenor Uniformed Fire Fighters of St. Paul, Local 21, is the exclusive bargaining representative for all fire fighters employed by the City of St. Paul in the ranks of Fire Captain and below. Intervenor James Fee is a Fire Captain on the St. Paul Fire Department and is a member of Local 21. Intervenor Fee is first on an existing list of those eligible for promotion from the rank of Fire Captain to the rank of District Fire Chief.

*Procedural History.*

9. Plaintiff commenced this action on December 18, 1979. At the time of filing its complaint, plaintiff also filed with the court a motion for an order restraining defendants from enforcement of the challenged mandatory retirement requirements as to District Chief Schmidt. On December 26, 1979, the court entered its order restraining defendants from taking any action with regard to those employees who had reached age 65 and further ordering that the then existing eligibility lists for promotion to the rank of District Chief be maintained intact by the City of St. Paul during the pendency of this action.

10. On February 19, 1980, the court issued its order granting the motions of Uniformed Fire Fighters of St. Paul, Local 21, and Fire Captain Fee to intervene in this action as parties defendant.

11. Prior to commencement of this action, representatives of plaintiff and the City of St. Paul attempted to conciliate the issues raised herein as is mandated by the provisions of 29 U.S.C. § 626(d) (1980).

*The St. Paul Fire Department.*

12. The Department is the agency of the City of St. Paul responsible to provide the City's residents with services designed to protect life and property from fire and other public hazards. In addition to fire fighting, the Department provides paramedic and ambulance services and engages in rescue and recovery operations which are not related to nor resultant from fire situations. The actual "fire fighting" component of the Department's mission involves fire suppression, life–saving and rescue operations at fire scenes, and fire prevention and investigation services.

13. The uniformed division of the Department is comprised of the ranks of Fire Chief, Assistant Chief, Deputy Chief, District Chief, Captain, Fire Equipment Operator, Firefighter, Fire Investigator and Fire Alarm Dispatcher. At the present time, approximately 450 persons are employed in the uniformed division. With the exceptions of the Fire Chief, his two Assistant Chiefs, and a few other administrative personnel, members of the uniformed division work duty shifts of 24 hours duration and are on–call at all times during their tours of duty.

*Duties of Fire Fighters.*

14. The evidence introduced at trial shows that fire fighting is an extremely hazardous and demanding occupation. Indeed, the evidence shows that it is the most hazardous of all civilian occupations in terms of both job–related injuries and deaths.

15. The dangers of the occupation of fire fighting arise from (1) the inherent dangers encountered at the scene of a fire, *i. e.*, the fire itself and the damage it does to the structure in which the fire fighter must work; (2) the strenuous nature of the tasks which must be performed in the sup-

pression of a fire; (3) the effects upon the human body caused by the fire environment itself; and (4) the hazards to health and safety which result from the fact that fires must be fought under conditions of extreme heat or extreme cold, and irrespective of any physical hazards of impediments existing at a particular fire scene.

16. The duties of those holding the ranks of Fire Captain and Firefighter include the actual combat and suppression of fires of all types and degrees of danger. They are required in the course of their duties to enter burning buildings, to engage in the rescue of any persons endangered by a fire, and to move equipment, which is often heavy and unwieldy, to the actual fire scene within a structure. These duties are physically demanding in the extreme and can be totally exhausting; they may require physical exertions for periods of time ranging from as little as 15 minutes to as long as 12 hours.

17. The duties of the District Chief are primarily those of supervision, discipline communication and training. The District Chief is generally in command at the scene of a fire. In addition, District Chiefs are expected to be able to occasionally perform, and are on occasion called upon to perform, physically demanding work at the fire scene. However, District Chiefs are expected to, and do, perform less physically demanding work than Captains and Firefighters.

18. At the scene of a fire, the first responsibility of any fire fighter, regardless of rank, is to save the life and provide for the safety of anyone endangered by the fire or its results. Rescue of those endangered by a fire is a strenuous activity which must be performed under hazardous conditions and in uncertain surroundings where vision may be impaired by smoke, hearing may be impaired by noise, and the integrity of the structure itself may already have been weakened by the fire. Fire Captains and Firefighters are expected to perform and do actually perform rescue operations at fire scenes. Much less frequently District Chiefs are expected to perform and do actu-

ally perform rescue operations at fire scenes.

19. The inability of personnel to engage in and efficiently and quickly perform necessary rescue operations could result in injury or death to a member of the public endangered by the fire.

20. The other duties which must be performed in the act of fire suppression are physically demanding in nature and, as is the case with rescue operations, the circumstances under which these activities must be done are exceedingly hazardous. In order to suppress a fire, equipment designed for that purpose must be taken to the actual location of the fire itself. This involves pulling hoses into a burning structure, ventilating a structure with the use of exhaust fans and axes, and applying an appropriate suppressant to the fire. While these tasks are being performed, the fire fighting personnel performing them are wearing heavy "turnout gear": boots, helmets, masks, and oxygen bottles.

21. The fact that the environment of a fire is a dangerous one is self-evident. Within the fire environment, personnel must work under conditions where they are subjected to the heat of the fire, where they are often exposed to noxious and poisonous gases, where vision is often obscured by smoke, where hearing is often impaired by noise, and where they are further endangered by the fact that the fire may cause the collapse of walls, ceilings or staircases.

22. District Chiefs are expected to perform many of the duties associated with fire suppression when the need arises, and on occasion are called upon to take active part in many aspects of fire suppression activities.

23. As a general rule, fire suppression and rescue activities are undertaken by members of the Department according to what is known as a "buddy system." This means that an employee is not to enter a fire scene alone. The purpose of the buddy system is to protect fire fighting personnel from being trapped in a fire without the assistance of another member of the Department. In the case of rescue operations,

the inability of a fire fighter to perform the duties demanded of him results not only in danger to the fire victim, but also in increased danger to his "buddy." In the case of fire suppression activities, physical inability to perform required duties can result in increased danger to those other fire fighting personnel who are depending upon the individual to get a hose to them or to bring replacement air bottles so they can breathe, as well as to the injured firefighter who is depending upon his companion for rescue.

24. In addition, the inability of fire fighting personnel to physically perform their suppression duties increases the likelihood of destruction of property by fire.

25. The working environment of the Department's District Chiefs, Fire Captains and Firefighters is an extremely dangerous and demanding one.

26. If for any reason a Fire Captain or a Firefighter is incapable of performing his duties, the risk of injury or death to members of the public and other members of the Department is increased and the risk of property damage in the City of St. Paul is increased.

27. The requirement that all Fire Captains and Firefighters have the ability to perform all fire suppression and life saving functions is necessary to the normal operation of the City's fire fighting business.

28. The requirement that all District Chiefs have the ability to occasionally perform life saving functions and several fire suppression functions is necessary to the normal operation of the City's fire fighting business.

29. The evidence introduced at trial indicates that high quality leadership at a fire scene will decrease the likelihood of on-scene fatalities.

30. A firefighter can qualify for a promotional examination for District Chief after 15 years on the force, including at least 5 years' experience in the rank of captain. Promotional examinations test the candidates for their knowledge of fire fighting and not for their ability to meet the physical and psychological demands of the position.

*The Effects of Age Upon Ability to Perform.*

31. The physical ability to perform under the hazardous conditions of a fire scene is adversely affected by the aging process after age 30.

32. The aging process affects all human beings and cannot be avoided. It manifests itself in virtually all physical and mental aspects of the human body.

33. As human beings age, a number of general physiological changes tend to occur. Physical stamina and the ability of the body to make efficient use of oxygen decline with age after age 30. Both aural and visual acuity decrease with age. The musculoskeletal system suffers "wear and tear" as a person ages. Moreover, at some point during the aging process, strength declines. Maintaining physical fitness can slow, but not stop, the aging process.

34. It has been shown that approximately 1%–2% of those under 30 years of age, and approximately 20% of the 65 year old population, have coronary artery disease.

35. As a person ages, his maximum attainable heart rate decreases. As a general rule of thumb, maximum attainable heart rate is ascertained by subtracting a person's age from the number 220.

36. Strains upon the cardiovascular system are exacerbated by the nature of the work fire fighters must perform and the dangers inherent in their duties. Heart disease is considered by many to be an occupational disease of fire fighting. A number of factors in the fire fighter's environment may be detrimental to the cardiovascular system. Among them are:

(a) The high levels of carbon monoxide to which fire fighting personnel are exposed. Carbon monoxide is present at every fire, often reaching its highest levels after the fire has largely been extinguished and personnel are engaged in activities of clearing the scene or searching the scene to insure

that the fire has been fully extinguished. Carbon monoxide has been suggested as a cause of coronary artery disease. In any event, carbon monoxide has a greater affinity for red blood cells than does oxygen, and low levels of carbon monoxide adversely affect the ability of the blood to carry oxygen to all tissues of the body and the ability of the body to make use of the oxygen it does receive.

(b) The fact that fire fighting personnel sustain elevated heart rates for extended periods of time in the performance of their duties.

(c) High adrenalin levels in the body caused by the "flight or fight" response created by the danger of the fire and by the sound of the alarm bell at the fire station.

(d) The stress of the fire fighting job.

(e) The fact that fire fighting personnel often are called from a sedentary state at the firehouse immediately into a situation in which they must engage in strenuous, exhausting and dangerous work.

37. The effects of aging are synergistic. As one function deteriorates, a person has the inclination to rely more heavily on other functions, such as on vision to compensate for a hearing loss. Since the relied upon function may also be deteriorating because of age, the overall effect of the aging process can in effect be greater than the "sum" of the effects on the adversely affected "parts."

38. Because of the nature of their duties, fire fighting personnel experience with age increasing risks of heart attack which are not faced by members of any other civilian occupation. However, there is evidence that *sudden death* due to heart attacks and strokes decreases in frequency for fire fighters over age 60.

39. The evidence demonstrates an inverse relationship between experience and fire fighter deaths at the fire scene. Moreover, statistics on the St. Paul Fire Department show there to be no significant correlation between aging and on–the-job injuries for District Chiefs or other fire fighting personnel.

40. The evidence introduced at trial establishes that as fire fighting personnel age, their physical ability to perform the demanding tasks required of them decreased about 5–15% per ten years of aging after age 30. This is caused by the effects of aging, which may be exacerbated by the conditions inherent in the occupation of fire fighting. Thus, as fire fighters age, the requirements of their positions at some point exceed their physical abilities. This point is reached for substantially all Captains and Firefighters at or before age 65. This point is not reached for substantially all District Chiefs at or before age 65.

*Testing.*

41. On January 1, 1980, the St. Paul Fire Department instituted a mandatory physical fitness program for all fire fighters, regardless of age. As part of this program, there is a medical interview to determine whether the fire fighter has some or all of the principle risk factors for heart disease: a family history of heart disease, being of the male sex, increased age, the practice of smoking cigarettes, high blood pressure, high levels of blood cholesterol or uric acid, sugar diabetes, excess body fat, and a lack of physical activity.

42. There is at the present time no single test or battery of tests by which an individual's ability to perform the strenuous tasks required of Captains and Firefighters, under the conditions in which they must of necessity be performed, can safely be measured with complete accuracy. In order for any test of physical ability to perform a given function to be an accurate predictor or indicator of actual performance, the test must be related to the function in which the subject is to engage. No safe laboratory test battery has yet been devised which duplicates the full range of duties which Captains and Firefighters must perform, since stress, heat, and the poisonous atmo-

sphere of a fire cannot be simulated. However, there presently are tests by which to safely determine, with great accuracy, an individual's ability to perform the occasional physical tasks required of District Fire Chiefs.

43. Plaintiffs suggest that a battery of tests be given, including x–rays to determine bone thickness, sensory tests for visual acuity, audiometric tests for hearing functions, bio–medical work tests, blood tests, psychometric measurements of intelligence and reaction time, and measurement of the elasticity of the skin. All of these tests can be performed by personnel already employed in connection with the St. Paul Fire Department's physical fitness program–*i. e.*, paramedics, technicians and doctors–who have been performing similar tests.

44. The test batteries suggested by plaintiff can predict, with the kind of reliability required because of the legitimate safety concerns present in this case, whether the individual being tested retains the mental and physical skills necessary to adequately perform as a District Chief. These same test batteries cannot predict, with the kind of reliability required because of the legitimate safety concerns present in this case, whether the individual being tested retains the mental and physical skills necessary to adequately perform as a Captain or Firefighter.

45. An electrocardiogram [EKG] monitored Exercise Stress Test ["stress test"] is a test used to determine the subject's fitness level and to detect the presence of underlying coronary artery disease. The subject is connected to an EKG monitor and walks on a treadmill, the grade and speed of which are increased as the test progresses. Given the duties fire fighters perform and the fact that heart disease can be considered an occupational disease, this is obviously a very important screening device which can be of use to the Department.

46. Stress test results for the members of the Department vary, with some persons over the age of 60 performing better than others under 60.

47. The stress test is the single best predictor of heart attacks presently known and is the best available test for detecting underlying coronary artery disease, but it is not a perfect predictive or diagnostic tool. A person with advanced coronary artery disease might have a normal stress test. In one study, two fire fighters who had "passed" the stress test suffered heart attacks shortly thereafter.

48. Studies place the probability of suffering a heart attack, given an initial abnormal stress test, at somewhere between 20 and 40 percent, more than 10 times the probability of one who has a normal stress test result. These studies also indicate that the probability of suffering a heart attack, given an initial normal stress test and a subsequent abnormal stress test, is approximately 85 percent. These studies further show that somewhere between 60 and 100 percent of those with coronary artery disease will have abnormal results on the stress test, depending on the population studied. The higher the incidence of coronary artery disease in the population, the higher the percentage of persons with coronary artery disease who will have positive stress test results.

49. There are other tests which could be administered which might be more accurate in detecting coronary artery disease. However, these tests are invasive and considered too dangerous for screening use.

50. The treadmill does not exactly duplicate the fire fighting environment, and consequently, one's performance on a stress test cannot predict performance as a fire fighter with complete accuracy.

51. The test batteries proposed by plaintiff, if administered to the Department on an annual basis, would cost a total of approximately $230,000. At present, the additional costs to the Department would be less because of existing expenditures on the Department's physical fitness program. Plaintiff has demonstrated that these tests would be helpful in predicting job performance.

52. The preponderance of the evidence does not indicate that some older District

Chiefs possess traits precluding safe and efficient job performance unascertainable other than through knowledge of the District Chief's age.

53. The preponderance of the evidence indicates that some older Firefighters and Captains possess traits precluding safe and efficient job performance unascertainable other than through knowledge of the Firefighters' and Captains' age.

54. There is no practical way to distinguish the qualified Captain or Firefighter who is 65 years of age or older from the unqualified Captain or Firefighter over the age of 64.

55. It is reasonably necessary to the normal operation of the St. Paul Fire Department that Captains and Firefighters be age 64 or younger.

56. It is not reasonably necessary to the normal operation of the St. Paul Fire Department that District Fire Chiefs be age 64 or younger.

Based upon the foregoing FINDINGS OF FACT, the court makes the following:

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1337, 1343 & 1345 (1980).

2. The plaintiff is authorized to bring this action pursuant to 29 U.S.C. § 626(b) (1980).

3. The plaintiff attempted to conciliate the issues raised herein, as required by 29 U.S.C. § 626(d) (1980).

4. At all times pertinent herein, the City of St. Paul has been an employer within the meaning of 29 U.S.C. § 630(b) (1980).

5. The City of St. Paul, having threatened to force individuals in the St. Paul Fire Department to retire because of age, has committed a *per se* violation of the Age Discrimination Employment Act, 29 U.S.C. § 621, *et seq.* (1980).

6. Plaintiff is not entitled to injunctive relief against the State of Minnesota, which neither threatens nor intends to enforce *Minnesota Statutes* § 423.075, Subd. 1 (1980).

7. For the positions of Captain and Firefighter, age is a bona fide occupational qualification reasonably necessary to the normal operation of the St. Paul Fire Department.

8. For the position of District Chief, age is not a bona fide occupational qualification reasonably necessary to the normal operation of the St. Paul Fire Department.

9. The provisions of *Minnesota Statutes* § 423.075, Subd. 1 (1980) violate the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (1980).

10. The provisions of St. Paul Ordinance No. 16591 violate the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (1980).

Based upon the foregoing FINDINGS OF FACT AND CONCLUSIONS OF LAW:

IT IS ORDERED That a permanent injunction be issued as follows:

IT IS HEREBY ORDERED That the defendant City of St. Paul, its officers, agents, employees, successors and assigns and all persons acting in concert or participation therewith are ENJOINED from requiring the retirement of any District Fire Chief of the St. Paul Fire Department solely on the basis of that District Chief's having reached the age of 65.

## MEMORANDUM

1. Defendant State of Minnesota

The State of Minnesota argues that it is not a proper defendant in this action because it has no plans to enforce the statute and therefore no interest in the litigation.[1] The court agrees. Although plaintiff clearly has standing to proceed against

---

[1] The State also contends that it is not subject to the Age Discrimination in Employment Act because it is not an "employer" and that it has not entered into attempts at conciliation with plaintiff, as required by 29 U.S.C. § 626(d) (1980). In light of its disposition of the State's first argument, the court will not address these contentions.

the City of St. Paul, it lacks standing as against the State of Minnesota, since the asserted injury is not the consequence of the State's actions and prospective relief will not remove the harm. *See Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975); *see also Duke Power Co. v. Environmental Study Group,* 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978); Rule 20(a) of the Fed.R. Civ.P. ("All persons ... may be joined in one action as defendants if there is asserted against them jointly [or] severally ... any *right to relief* ...) (emphasis added). Consequently, pursuant to Rule 21 of the Fed. R.Civ.P., the court shall dismiss the State of Minnesota as a defendant. *See Rakes v. Coleman,* 318 F.Supp. 181, 193 (D.Va.1970).

2. Defendant City of St. Paul and Intervenors

In its complaint in the above–entitled action, plaintiff requests that the court permanently enjoin defendants City of St. Paul and State of Minnesota from engaging in any terminating practices which discriminate on the basis of age and from forcing District Fire Chief George Schmidt to retire unless he is proven unqualified to perform his duties and responsibilities as District Fire Chief.[2] The parties were advised prior to trial that the court would take evidence on the validity of requiring District Fire Chiefs, Captains and Firefighters to retire at age 65. Counsel for all parties very ably presented the evidence and framed the issues with this in mind, and the court will rule on the validity of the City of St. Paul's mandatory retirement policy as it relates to District Fire Chiefs, Captains and Firefighters.

The court's starting point is the interpretation of the Age Discrimination in Employment Act by the United States Court of Appeals for the Eighth Circuit. In *Houghton v. McDonnell Douglas Corp.,* 553 F.2d

561 (8th Cir. 1977), the Court of Appeals held that an employer's decision to retire employees solely on the basis of age is a *per se* violation of 29 U.S.C. § 623(a), and shifts to the employer the burden of proving that it has "a factual basis for believing that substantially all of the older employees are unable to perform their duties safely and efficiently or that some older employees possess traits precluding safe and efficient job performance unascertainable other than through knowledge of the employees' age." 553 F.2d at 564.

 The evidence indicates that substantially all Captains and Firefighters would be unable to perform their duties safely and efficiently after the age of 64. The duties of Firefighters and Captains are extremely difficult, demanding very strenuous physical activities in extremely hazardous conditions for long periods of time. There was no evidence presented to demonstrate that anyone over the age of 65 can perform the physical labor required of Firefighters and Captains wearing approximately 50 pounds of equipment in an environment of extreme heat for several hours. Although people age at different rates and can delay the debilitating effects of age through physical exercise, the undisputed evidence is that a person loses a substantial portion of his or her strength and–more importantly–endurance by age 65. The evidence indicates that a Captain or Firefighter will at some point lose so much strength and endurance that he cannot safely and efficiently perform all of the arduous tasks required of him over several hours at the fire scene. The evidence further indicated that this point is reached for substantially all Captains and Firefighters at or before the age of 65. The failure of a Captain or Firefighter to safely and efficiently perform his duties at the fire scene would endanger other firefighters, particularly in light of the "buddy system." If the bona fide occupational

---

2. Plaintiff also requested a judgment requiring defendants to pay George Schmidt appropriate back pay and liquidated damages. Because a court order prevented George Schmidt from being forced to retire, this request has been abandoned.

qualification ever is to be invoked because of the inability of substantially all members of a group to adequately perform their duties, it should be invoked here. The requirement that Captains and Firefighters retire at age 65 is reasonably necessary to the normal operation of the St. Paul Fire Department.

■ The same is not true of the requirement that District Fire Chiefs retire at age 65. The evidence clearly does not give the City of St. Paul a factual basis for believing that substantially all District Chiefs are unable to perform their duties safely and efficiently after the age of 64. In fact, defendant City of St. Paul admits that George Schmidt, the only District Chief over age 64 about whom testimony was presented, can perform his duties adequately.

Although a much closer question, intervenors and defendant City of St. Paul also have failed to carry their burden of proving that there is a factual basis for believing that some District Chiefs over the age of 64 possess traits precluding safe and efficient job performance unascertainable other than through knowledge of the District Chiefs' age. The traits which intervenors and defendant City of St. Paul point to as precluding safe and efficient job performance are susceptibility to heart attack and loss of strength and stamina.[3] However, defendant City of St. Paul and Intervenors could not point to a single incident where the lives and safety of the St. Paul firefighters or the public were jeopardized because of the performance of older District Chiefs. Moreover, evidence presented at trial indicates that District Chiefs over the age of 64 are no more likely than other District Chiefs to experience injuries at fire scenes, that District Chiefs over the age of 60 are less prone than younger District Chiefs to

sudden death due to heart attacks and strokes, and that District Chiefs over the age of 64 retain sufficient strength and endurance to adequately perform their duties. Thus, the evidence introduced at trial does not establish that the traits of susceptibility to heart attack and loss of strength and endurance preclude District Chiefs over the age of 64 from safely and efficiently performing their duties. To the contrary, the evidence indicates that older, more experienced District Chiefs generally are better able than younger, less experienced District Chiefs to determine the hazards at a fire scene and direct fire fighting activities so as to avoid fire fighter injuries and fatalities.[4]

The fact that District Chiefs over the age of 64 are more likely than younger District Chiefs to suffer heart attacks away from the fire scene is not particularly pertinent here. A high susceptibility to heart attack clearly does not, by itself, preclude the safe and efficient performance of the District Chief's duty. If it did, the Department would force District Chiefs to retire because their family history, cigarette smoking, blood pressure, blood cholesterol level or stress test results demonstrated a similarly high susceptibility to heart attack.

There is no inconsistency in the court's findings that Captains and Firefighters over the age of 64 cannot adequately perform their functions while District Chiefs over the age of 64 can. The duties of District Chiefs are very different from those of Captains and Firefighters, being mostly supervisory and involving infrequent physical activity for short periods of time. Loss of endurance is much less significant to a District Chief than to a Captain or Firefighter, and would not preclude a District Chief from safely and efficiently performing his job.

**3.** No attempt was made to show that senility, which may preclude safe and efficient job performance, is unascertainable other than through knowledge of a person's age.

**4.** The importance of a District Chief's experience and judgment is highlighted by the fact that the promotional examination for District Chief is a *written* exam testing what one would do in various situations at the fire scene.

█ The evidence further indicates that susceptibility to heart attack and possession of the muscle strength and endurance required by District Chiefs may be ascertained with greater accuracy by individual testing them on the basis of age. Muscular strength and stamina vary greatly by individual, as do their rates of decline. However, muscular strength may be easily measured, and possession of the stamina required of District Chiefs may be determined with sufficient accuracy by a stress test or by requiring District Chiefs to walk a certain distance in full fighting gear.[5] In addition, it is clear that age is a less accurate predictor of heart attacks than stress tests alone or stress tests coupled with blood cholesterol and blood pressure readings and personal interviews. Requiring a person to retire at age 65 on the assumption that all persons of that age have a high risk of heart attack or low muscle strength and endurance cannot be reasonably necessary to the normal operation of the St. Paul Fire Department when at the same time employees of a lesser age are retained who can easily be determined to have high risks of heart attack and minimal muscle strength or endurance.

In *Aaron v. Davis*, 414 F.Supp. 453 (E.D. Ark.1976), the court addressed issues very similar to those presented in this case. As here, there was "somewhat of a tradition within the fire department that all personnel from top to bottom actively participate in the fire fight when required by an appropriate alarm to be at the fire site." *Id.* at 456–57. Nevertheless, the court found that the intervenors and defendants had failed to carry their burden of establishing that being of age 61 or less was a bona fide occupational qualification for District Chiefs under 29 U.S.C. § 623(f)(1). The court's reasoning in *Aaron v. Davis* is applicable here:

It may well be that scientific and medical research and studies currently under way, or in the offing, may provide empirical data showing, statistically at least, the inability of a large percentage of this age group to adequately perform [their] duties.... On the present record, however, there is nothing to show the special relevance of the age 62 mandatory retirement requirement, and therefore, the [ordinance in question] can only be deemed ... wholly lacking in any justifiable business necessity [as it relates to District Chiefs]. [*Id.*, at 463.]

Congress apparently intended that the bona fide occupational qualification be very narrowly construed and thus applicable in very few cases. *See* 29 C.F.R. § 860.102 (1980). Congress may subsequently determine, in light of the results in cases under the Age Discrimination in Employment Act, that the bona fide occupational qualification exception should be broadened or that the Act should otherwise be amended. Under the present law, however, as District Chiefs are infrequently required to perform life–saving duties, and then only shortly after arriving at the fire scene, when they will be least affected by fatigue or carbon monoxide, the court is compelled to conclude that age is not a bona fide occupational qualification for St. Paul District Fire Chiefs.

█

---

**5.** In contrast, the endurance required of Captains and Firefighters–who must perform strenuous tasks for several hours near extreme heat–cannot be satisfactorily determined by individual testing. For Captains and Firefighters,

it is reasonably necessary to rely on age as an indicator of inability to perform adequately.