Robert W. JOHNSON, August T. Stern, Jr., Thomas C. Doyle, Mitchell Paris, Robert L. Robey and James Lee Porter, Plaintiffs,

and

Equal Employment Opportunity Commission, Intervening Plaintiff,

v.

The MAYOR AND CITY COUNCIL OF BALTIMORE and Hyman A. Pressman, as Chairman and Donald D. Pomerleau, Calhoun Bond, Edward C. Heckrotte, Sr., Charles Daugherty, Paul D. Wolman, Jr. and Curt Heinfelder, members of the Board of Trustees, Fire and Police Employees Retirement System of the City of Baltimore, Defendants.

Civ. A. No. H–79–998.

United States District Court, District of Maryland.

June 9, 1981.

**1288**

Paul D. Bekman, William H. Engelman and Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Baltimore, Md., for plaintiffs.

Frederick P. Charleston, Trial Atty., Equal Employment Opportunity Commission, Baltimore, Md., for intervening plaintiff.

Ambrose T. Hartman, Deputy City Sol., and Glenn M. Grossman and L. William Gawlik, Asst. City Sols., Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, District Judge:

In this civil action, the six plaintiffs, who are Baltimore City firefighters, are challenging provisions of the Baltimore City Code which require that certain Fire Department employees retire at the ages of fifty-five and sixty. Plaintiffs contend that this legislation (1) violates provisions of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. § 621, *et seq*;[1] (2) contravenes 42 U.S.C. § 1983; and (3) is violative of the Fourteenth Amendment. As relief, plaintiffs are seeking a declaratory judgment, a permanent injunction, back pay for plaintiff Johnson, attorneys' fees and costs.

Five of the six plaintiffs are presently over sixty years of age.[2] Had they not filed this suit, each of these five plaintiffs would now have been mandatorily retired, pursuant to applicable provisions of the Baltimore City Code. However, with the con-

---

1. Plaintiffs also contend that the City ordinance violates 29 U.S.C. § 215. However, that provision of the Fair Labor Standards Act is merely an enforcement provision incorporated into the ADEA. *See* 29 U.S.C. § 626(b).

2. Plaintiffs Johnson, Stern, Doyle, Paris and Robey are all over sixty years of age. Plaintiffs have complied with the exhaustion requirements of 29 U.S.C. § 626(d).

sent of the defendants, a Temporary Restraining Order has been entered in this case, permitting these five plaintiffs to retain their jobs and their employment benefits during the pendency of this action. The sixth plaintiff, James Lee Porter, is presently thirty-two years of age. He will be required to retire under the Baltimore City law in question in the year 2003, when he becomes fifty-five.

Named as defendants are the Mayor and City Council of Baltimore and the Chairman and members of the Board of Trustees of the Fire and Police Employees Retirement System of the City of Baltimore (hereinafter the "FPERS"). Subsequent to the commencement of this action, the Equal Employment Opportunity Commission was permitted to intervene as a party plaintiff and has filed an intervening complaint. Following extensive pretrial proceedings, this case came on for trial before the undersigned Judge, sitting without a jury. Testimony was heard from expert and other witnesses, and numerous exhibits have been entered in evidence. Findings of fact and conclusions of law under Rule 52(a), F.R. Civ.P., are contained in this Opinion, whether or not expressly so designated.

## I

### The challenged provisions of law

Prior to 1962, employees of the Baltimore City Fire Department, like other municipal employees, were covered by the Employees Retirement System of the City of Baltimore (hereinafter the "ERS").[3] See Article 22, §§ 1–17, Baltimore City Code (as amended). This pension and retirement system contains a provision for mandatory retirement at age seventy.

Pursuant to enabling legislation enacted by the Maryland State Legislature, the Baltimore City Council, in 1962, approved an ordinance establishing a new retirement system for Fire Department and Police Department employees only, namely the

FPERS, which is at issue here. The provisions applicable in this case, as set forth in Article 22, § 34(a), Baltimore City Code (as amended), are as follows:

(2) Any member in service who has attained the age of fifty-five shall be retired on the first day of the next calendar month after attaining such age, except that a member who has attained the rank of Fire Lieutenant or Police Sergeant, or equivalent grade as certified by the Department head and approved by the Board of Trustees, shall be retired when he has attained the age of sixty-five.

\*　\*　\*　\*　\*　\*

(4) Further, anything in this subtitle to the contrary notwithstanding, any employee covered by this System, under the rank of Fire Lieutenant or Police Sergeant, or equivalent grade, who was in service on July 1, 1962, may be continued in service until attaining age 60.

In this suit, the plaintiffs contend that these provisions which require them to retire at ages fifty-five and sixty violate the ADEA, § 1983 and the Fourteenth Amendment.

## II

### Facts

Plaintiff Robert W. Johnson commenced his employment with the Baltimore City Fire Department in October of 1943. On April 29, 1979, Johnson attained the age of sixty years. Under § 34(a)(4), Johnson was retired involuntarily on May 1, 1979. This suit was filed on May 29, 1979. Pursuant to the Temporary Restraining Order entered by the Court, Johnson was restored to pay status on June 11, 1979.[4] In addition to the other relief sought by the other plaintiffs, Johnson seeks back pay from May 1 to June 11, 1979 in the amount of $1,000.00. Plaintiff August T. Stern, Jr. commenced his

---

3. Employees of the City of Baltimore other than firefighters and policemen continue to be covered by the ERS.

4. Plaintiff Johnson is the only one of the plaintiffs whose employment has been interrupted. Thus, he is the only plaintiff seeking back pay.

employment with the Fire Department in February 1946. He became sixty years of age on September 17, 1979. Plaintiff Thomas C. Doyle started working with the Fire Department in March of 1947, and became sixty years of age on October 7, 1979. Plaintiff Mitchell Paris commenced his employment with the Fire Department in December of 1946, and he attained the age of sixty on January 21, 1981. Plaintiff Robert L. Robey started working with the Fire Department on October 10, 1951, and became sixty on March 26, 1981. Plaintiffs Stern, Doyle, Paris and Robey have also been continued as Baltimore City firefighters pursuant to this Court's Temporary Restraining Order. Like plaintiff Johnson, they all desire to continue to work for the Baltimore City Fire Department beyond age sixty. Plaintiffs are not here challenging the right of the defendants to retire them involuntarily at age sixty-five, which is the mandatory retirement age under present law for Lieutenants and other officers of the Fire Department.

Plaintiff James Lee Porter commenced his employment with the Baltimore City Fire Department on May 6, 1969. On October 23, 2003, plaintiff Porter will attain the age of fifty-five. Since he did not become a firefighter until after July 1, 1962, he will be required under the aforementioned § 34(a)(2) and (4) to retire at age fifty-five whether he wishes to or not.

Plaintiffs Johnson, Stern, Doyle, Paris and Robey were all formerly members of the ERS. When the new ordinance establishing the FPERS was adopted by the City Council in 1962, these five plaintiffs, in 1962 or thereafter, chose to be covered by the new retirement system rather than the old.

## III

### The ADEA

When it enacted the ADEA in 1967, Congress included a statement of its findings and purpose in passing this legislation. 29 U.S.C. § 621 provides as follows:

(a) The Congress hereby finds and declares that—

(1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

(2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

(3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;

(4) the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

(b) It is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

§ 623(a)(1) is as follows:

(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; * * *

As originally enacted in 1967, the ADEA was not applicable to governmental entities. However, in 1974, Congress amended the Act to include states and political subdivisions within its coverage. The term "employer" now includes "a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State * * *" *See* 29 U.S.C. § 630(b).

Certain employer practices were recognized by the Act as being lawful. § 623(f)(1) provides as follows:

(f) It shall not be unlawful for an employer * * * (1) to take any action otherwise prohibited under subsections (a) * * * of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age; * * *

As originally enacted in 1967, § 623(f)(2) provided as follows:

(f) It shall not be unlawful for an employer * * * (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual;

In 1978, § 623(f)(2) was amended so that it now reads:

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, *and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual.* (Emphasis added.)

Congress added the language emphasized above for the express purpose of overruling the Supreme Court's decision in *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977). *See* House Conference Report 95–950, 95th Cong., 2d Session, [1978] U.S.Code Cong. and Admin. News, pp. 504, 529. In the *McMann* case, the Supreme Court had held that a bona fide pension plan established prior to the effective date of the ADEA could not be a subterfuge to evade the purposes of the Act. 434 U.S. at 203. The 1978 amendment to § 623(f)(2) makes it clear that the Act applies to FPERS, even though that retirement plan was established before the ADEA was enacted. Furthermore, as the Fourth Circuit noted in *EEOC v. Baltimore and Ohio R.R. Co.,* 632 F.2d 1107, 1112 (4th Cir. 1980), the 1978 amendment explicitly prohibits the provisions of § 623(f)(2) from being utilized as a defense to involuntary retirement of protected individuals.

In this suit, plaintiffs assert that § 34(a)(2) and (4) of Article 22 of the Baltimore City Code are contrary to § 623(a)(1) and § 623(f)(2) because the FPERS requires the involuntary retirement of each of them because of their age. Defendants contend (1) that the ADEA is unconstitutional; (2) that plaintiffs have waived their right to rely on the benefits of this federal statute; and (3) that pursuant to § 623(f)(1), age is a bona fide occupational qualification for firefighters which is reasonably necessary to the normal operation of the Baltimore City Fire Department.

## IV

### *The constitutionality of the ADEA as applied to states and political subdivisions*

Relying on *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), defendants first contend that the ADEA may not be constitutionally applied to employees of a state or political subdivision. As noted hereinabove, Congress amended the Act in 1974 to include states and political subdivisions within the definition of the term "employer", as used in the Act. *See* 29 U.S.C. § 630(b).[5] Defendants contend that by extending the coverage of the ADEA to public employees in 1974, Congress has unconstitutionally usurped the regulation of essential government functions properly reserved to state and local governments.

5. This amendment became effective on May 1, 1974.

Defendants' constitutional argument was previously rejected by the Fourth Circuit in *Arritt v. Grisell*, 567 F.2d 1267 (4th Cir. 1977). In that case, a police officer in Moundsville, West Virginia had been denied employment by that city because he was forty years of age and therefore ineligible to take the required physical and mental examinations under West Virginia law, which had established an eighteen to thirty-five year age limit for such applicants. In an opinion written by Judge Thomsen, the Fourth Circuit reversed the District Court's entry of summary judgment in favor of the defendants and remanded the case to the lower court for the development of a full factual record concerning plaintiff's claim that the West Virginia statute violated the ADEA.

As in this case, the defendants in *Arritt* argued that the Supreme Court decision in *National League of Cities v. Usery, supra,* invalidated the 1974 amendments to the ADEA which extended coverage of its anti-discrimination provisions to state and local government employers. That decision of the Supreme Court had held that the extension of provisions of the Fair Labor Standards Act to state and local government employees engaged in areas of traditional governmental functions could not be upheld as a constitutionally valid regulation of interstate commerce because the Tenth Amendment limits exercise of the powers of Congress under the commerce clause. After considering the legislative history of the ADEA and the Supreme Court's opinion in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Fourth Circuit in *Arritt* upheld the 1974 amendments to the Act. Writing on behalf of the panel, Judge Thomsen concluded that in enacting the ADEA and extending it to the states, Congress had exercised its powers under § 5 of the Fourteenth Amendment rather than under the commerce clause. 567 F.2d at 1270–1271.

■■■ The recent *Arritt* decision is controlling in this case. As the Fourth Circuit there held, the 1974 amendments to the ADEA are not unconstitutional. Thus, the City of Baltimore is subject to the provisions of the ADEA, and if a city ordinance conflicts with provisions of this Congressional statute, the ordinance in question must fall.[6]

## V

### *Waiver*

Defendants next argue that even if the City of Baltimore and its Fire Department are subject to the provisions of the ADEA, the plaintiffs waived their right to rely on benefits conferred upon them by this Act when they voluntarily became members of the FPERS in 1962 or thereafter. In support of this contention, defendants assert that five of the plaintiffs contractually agreed to retire at age sixty when they became members of the FPERS.

In 1925, the City of Baltimore established the first actuarially funded pension system in Maryland for the general protection of municipal employees, known as "The Employees' Retirement System of the City of Baltimore" (the "ERS"). *See* Article 22, §§ 1–17, Baltimore City Code (as amended). That pension system, both then and now, contains a provision for mandatory retirement at age seventy. Both firefighters and policemen were covered by the ERS.

Following various studies supported by City firemen and their unions, a recommendation was made to the City Board of Estimates in 1960 that retirement benefits for members of the Fire Department should be liberalized. Following the enactment of enabling legislation by the State Legislature in 1961, an ordinance was introduced in 1962 before the Baltimore City Council, providing for the establishment of the Fire and Police Employees Retirement System (the "FPERS"). This legislation lowered the mandatory retirement age for firemen and

---

**6.** Other cases reaching the same conclusion include *Marshall v. Delaware River & Bay Authority*, 471 F.Supp. 886 (D.Del.1979); *Rem-* *mick v. Barnes County*, 435 F.Supp. 914 (D.N. D.1977); and *Usery v. Board of Education of Salt Lake City*, 421 F.Supp. 718 (D.Utah 1976).

police officers from age seventy to age fifty-five or sixty. A "grandfather clause" was included to permit firefighters, other than officers, who were in service on July 1, 1962 to continue to work until age sixty. Moreover, those in service on that date could, if they chose to do so, continue to be covered by the ERS. However, anyone who was employed after July 1, 1962 was required to retire at the age of fifty-five and was not permitted to be covered by the ERS. Officers of the Fire Department were permitted to continue until age sixty-five before being required to retire.

The proposed new ordinance was presented to the membership of both the Fire Department and the Police Department, and some 59% of the Fire Department personnel affected voted in favor of the new system. In June of 1962, the ordinance was passed by the City Council. Some members of the City Fire Department chose not to join the new system, but continued to be covered by the ERS. Others, including the plaintiffs, elected to become members of the FPERS. Plaintiffs Stern and Doyle joined the new system in 1962, while plaintiffs Robey and Paris did so in 1967. Plaintiff Johnson, in July 1962, initially decided to remain in the ERS, but in June of 1963, he elected to become a member of the FPERS. Defendants contend that when the plaintiffs elected to become members of the new system, they waived any rights they might have under the ADEA and voluntarily agreed to retirement at age sixty.

■ Before a court can find that a federal right has been waived, it must be established that there was an intentional relinquishment or abandonment of a known right or privilege. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Courts indulge every reasonable presumption against waiver of fundamental rights, and a court cannot presume acquiescence in the loss of a fundamental right. *Id.* at 464, 58 S.Ct. at 1023.

These principles were recently applied by the Supreme Court in a case presenting the question of a claimed waiver of an employee's rights under Title VII of the Civil Rights Act of 1964. *See Alexander v. Gardner-Denver Company*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). In that case, the Supreme Court concluded that there could be no prospective waiver of an employee's rights under Title VII. Noting that an individual's right to equal employment opportunities represented a Congressional command that each employee be free from discriminatory practices, the Supreme Court pointed out that waiver of such a right would result in defeating the paramount Congressional purpose behind Title VII. 415 U.S. at 51–52, 94 S.Ct. at 1021. Accordingly, the Supreme Court concluded that an employee's rights under Title VII are not susceptible of prospective waiver.

■ These principles are equally applicable here. Plaintiffs made their decisions to join the FPERS in 1962, 1963 and 1967. The ADEA was enacted by Congress in 1967, but it was not until 1974 that employees of state and local governments were included within provisions of the statute. In 1978, the law was again amended to preclude the involuntary retirement of an individual because of age pursuant to an established pension plan or seniority system. Under these circumstances, it can hardly be concluded that plaintiffs waived their rights under the ADEA by joining the FPERS between 1962 and 1967. In those years, they had no right to challenge provisions of the FPERS which required them to retire at age sixty or fifty-five, and therefore there was no known right for them to relinquish when they decided to join the new retirement system. Under federal standards, one may not relinquish intentionally an unknown right. *Nelson v. Peyton*, 415 F.2d 1154, 1158 (4th Cir. 1969), *cert. denied*, 397 U.S. 1007, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970); *Dodge v. Turner*, 274 F.Supp. 285, 289 (D.Utah 1967); *see Walker v. Peppersack*, 316 F.2d 119, 127–28 (4th Cir. 1963).

This Court's conclusion that plaintiffs have not waived their rights under the ADEA is supported by the Fourth Circuit's opinion in *McMann v. United Air Lines, Inc.*, 542 F.2d 217 (4th Cir. 1976). In that

case, the Court placed no significance on the fact that the plaintiff could have chosen not to join the retirement plan claimed to violate the ADEA. 542 F.2d at 219, n.1.

■ Nor is there merit to defendants' argument that plaintiffs are bound contractually to retire at ages sixty or fifty-five because they have agreed to the terms of the FPERS. A similar contention was rejected by Judge Miller of this Court in *Chastang v. Flynn & Emrich Co.*, 365 F.Supp. 957 (D.Md.1973). There, the argument had been made that the plaintiffs had waived their Title VII rights by executing releases. Judge Miller held that a statutory right "conferred upon a private party, but affecting the public interest may not be waived or released, if such waiver or release contravenes the statutory policy." 365 F.Supp. at 968. The same principles are applicable here.

For these reasons, this Court finds and concludes that the plaintiffs did not waive or surrender their rights under the ADEA when they joined the FPERS at various times between 1962 and 1967.

## VI

### *The bona fide occupational qualification defense*

The principal issue presented in this case and the one to which most of the evidence has been directed is whether age is a bona fide occupational qualification (hereinafter "BFOQ") for Baltimore City firefighters. This defense is specifically recognized by § 623(f)(1), which permits an employer to take any action otherwise prohibited by the Act where age is a bona fide occupational qualification "reasonably necessary to the normal operation of the particular business * * *" Relying on this statutory provision, defendants contend that the Act is not violated by provisions of the Baltimore City Code which require that five of the plaintiffs retire at age sixty, whether or not they wish to do so.[7]

### (a) *Prima facie case*

■ Plaintiffs initially have the burden of establishing that their rights under the ADEA have been violated. A *prima facie* case of age discrimination is made out where a plaintiff proves (1) that he is a member of the protected group; (2) that he has been terminated; (3) that he has been replaced by a person outside the protected group; and (4) that he was qualified to do the job. `*Marshall v. Baltimore & Ohio Railroad Company*, 461 F.Supp. 362, 372 (D.Md. 1978), *aff'd in part and rev'd in part, EEOC v. Baltimore & Ohio Railroad Company*, 632 F.2d 1107 (4th Cir. 1980).

■ In this case, there is little doubt that plaintiffs have fully satisfied this burden and have established a *prima facie* case under the ADEA. Plaintiffs, who are over sixty years of age, are members of the group protected by the Act. The employment of plaintiff Johnson has in fact been terminated, and the other plaintiffs would have been involuntarily terminated had this Court not entered a Temporary Restraining Order which continued their employment. Had the employment of the plaintiffs been terminated under the FPERS, younger persons would have taken their place. Finally, the evidence discloses that the plaintiffs, despite their age, are fully qualified to perform their duties as Baltimore City firefighters. No evidence to the contrary has been presented. Rather, the record in this case clearly establishes that plaintiffs' performance of their duties has been more than satisfactory.

For these reasons, this Court finds and concludes that plaintiffs have made out a *prima facie* case of age discrimination under the ADEA. As applied to them, the provisions of § 34(a) which require that they retire involuntarily at age sixty violate the ADEA, unless defendants can prove that their acts under the Ordinance are not unlawful pursuant to § 623(f)(1).

---

7. This portion of the Opinion (Section VI) will discuss only the claims of the five plaintiffs who are presently over sixty years of age. Accordingly, the term "plaintiffs", as used in this Section, refers to all plaintiffs except Porter, whose claim will be discussed hereinafter. The term "firefighters" as used herein, includes emergency vehicle drivers and pump operators.

### (b) *Defendants' burden*

■ Once a plaintiff has made out a *prima facie* case of age discrimination under the ADEA, the burden shifts to the employer to establish a BFOQ defense. *Arritt v. Grisell, supra; Houghton v. McDonnell Douglas Corporation*, 553 F.2d 561, 564 (8th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977).[8] In *Arritt*, the Fourth Circuit rejected the standard adopted by the Seventh Circuit in *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859 (7th Cir. 1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975), for measuring the burden assumed by the employer when a *prima facie* case of age discrimination has been made out. Rather, the Fourth Circuit adopted the two-pronged test formulated in *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 236 (5th Cir. 1976). Thus, in this case, the defendants have the burden to show (1) that the BFOQ which it invokes is "reasonably necessary to the essence of its business" of operating an efficient fire department within the City of Baltimore, and (2) that defendants have "reasonable cause, i. e., a factual basis for believing that all or substantially all persons within the class * * * would be unable to perform safely and efficiently the duties of the job involved, or that it is impossible or impractical to deal with persons over the age limit on an individualized basis." 567 F.2d at 1271. In this case, the class involved includes all Baltimore City firefighters, other than officers, who are sixty but not yet sixty-five years of age. Defendants here must prove that there is a factual basis for believing that all or substantially all Baltimore City firefighters between sixty and sixty-five are unable to perform their duties safely and efficiently, or that Baltimore City firefighters between those ages may not possibly or practically be dealt with on an individualized basis.

In considering whether defendants have in this case met their burden of establishing a BFOQ defense, this Court must be guided by the objectives which Congress had in mind when it enacted the ADEA. Congress went so far as to expressly incorporate into the statutory language itself its findings that older workers find themselves disadvantaged in their efforts to retain employment, that the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and that the employment problems of older workers are grave. § 621(a). Congress further expressly stated that the purpose of the ADEA is to promote the employment of older persons based on their ability rather than their age, to prohibit arbitrary age discrimination in employment and to assist employers and workers in finding ways to meet problems arising from the impact of age on employment. § 621(b).

Recent opinions discussing the BFOQ defense asserted by an employer under § 623(f)(1) indicate that the burden imposed on a defendant of establishing this affirmative defense is a substantial one. In *Houghton v. McDonnell Douglas Corporation, supra*, the Eighth Circuit reversed the finding of the District Court that the employer of a test pilot had properly terminated his employment at age fifty-two, because age was a BFOQ for test pilots. Citing *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228, 235 (5th Cir. 1969), the Eighth Circuit concluded that to uphold the District Court's finding that defendant had met its burden in that case would allow the BFOQ exception to swallow the rule. 553 F.2d at 564. In *EEOC v. City of St. Paul*, 500 F.Supp. 1135, 1146 (D.Minn.1980), the Court, in concluding that age was not a BFOQ for fire chiefs of the City of St. Paul, noted that Congress "apparently intended that the bona fide occupational qualification be very narrowly construed, and thus applicable in very few cases. *See* 29 C.F.R. § 860.102 (1980)." In *Sexton v. Beatrice Foods Co.*, 630 F.2d 478, 486 (7th Cir. 1980), the Seventh Circuit, in considering § 623(f)(2), observed that exceptions of this sort to a remedial statute are to be narrowly and strictly construed.

---

**8.** In the *Houghton* case, the Eighth Circuit concluded that the employer's admission that the plaintiff's removal was solely on the basis of his age presented a *per se* violation of § 623(a).

### (c) Discussion

On the record here, this Court finds and concludes that defendants have not met their burden of proving under § 623(f)(1) that age constitutes a BFOQ for the requirement of § 34(a) that the plaintiffs retire at age sixty. Defendants have not convinced this Court that the retirement of City firefighters at that age is reasonably necessary for the operation of an efficient fire department within the City of Baltimore. Furthermore, defendants have not shown, on this record, that there is a factual basis for them to believe that all or substantially all Baltimore City firefighters between the ages of sixty and sixty-five, other than officers, would be unable to perform their duties safely and efficiently. Finally, defendants have not proved that it is impossible or impractical to deal with firefighters between sixty and sixty-five on an individualized basis.

In attempting to meet their burden, defendants first emphasize the arduous nature of firefighting duties and the physical demands of the job. They point out that the duties of firefighters include periods of relative inactivity followed by those of intense physical activity. During a fire, plaintiffs and other firefighters are exposed to intense heat (or in winter, extreme cold), must work in smoke-filled environments in the presence of toxic substances and must perform their duties under great stress.

In the absence of other evidence in the record, these facts might have significance. However, when the record as a whole is considered, this Court is satisfied that defendants have not met their burden of proving that all or substantially all employees of the Baltimore City Fire Department cannot safely and efficiently perform their demanding duties between the ages of sixty and sixty-five.

Insofar as five of the plaintiffs are concerned, this case involves their performance for a period of only five years, namely their ability to perform their duties adequately at ages sixty through sixty-four inclusive. Plaintiffs are not here challenging the right of the defendants to require their mandatory retirement at age sixty-five. That is the age when officers of the Fire Department must retire, and plaintiffs are not contending that they have the right under the ADEA to work as firefighters beyond that age.[9] For these reasons, nothing in this Opinion should be construed as deciding whether the City of Baltimore has the right to require the mandatory retirement of Fire Department employees at age sixty-five.

The starting point in evaluating the job performance of Baltimore City firefighters after age sixty is the manner in which the plaintiffs themselves have performed since they attained that age. The evidence is overwhelming that plaintiffs have not only performed satisfactorily since they became sixty, but in most instances their performance has been more than satisfactory and even exceptional. Plaintiff Johnson is sixty-two years of age, plaintiffs Stern and Doyle are sixty-one and plaintiffs Paris and Robey are sixty. The evidence presented indicates that all five of these plaintiffs are today as qualified as younger employees of the Department to perform their duties as firefighters. Indeed, defendants have not sought to introduce any evidence to indicate that any one of the plaintiffs cannot carry out his assigned duties because of physical or other reasons. One Fire Department Captain testified that advancing age had not adversely affected plaintiff Stern's performance, and another Captain characterized Stern as being an "exceptional" firefighter today. Stern was rated as "outstanding" in his 1979–1980 performance evaluation report. Other evidence indicated that other plaintiffs were "good", "effective" or "very efficient" in the performance of their firefighting duties.

The testimony of firefighter Grove (who is not a plaintiff) supports that of the plain-

---

**9.** Indeed, plaintiffs' evidence indicates that officers regularly perform at fires the same duties as firefighters of lesser rank and, conversely, that firefighters undertake officers' duties in the absence of the latter. Essentially, plaintiffs are seeking in this case the same mandatory retirement age that the City applies to officers of the Fire Department.

tiffs and of the Fire Department officers who evaluated plaintiffs' performances. Grove is sixty-nine years of age and will have been with the Department for thirty-nine years when he retires in August of 1981 at age 70.[10] In a three-alarm fire that occurred in January 1981, Grove performed arduous firefighting duties over a period of four hours without difficulty. His testimony and that of the plaintiffs themselves supports this Court's findings on this record (1) that plaintiffs have performed their firefighting duties satisfactorily since they became sixty, and (2) that they may be expected to continue to so perform until they reach the age of sixty-five.[11]

Defendants' argument that substantially all Baltimore City firefighters would be unable at age sixty to perform their duties safely and efficiently is undercut by the fact that historically Baltimore firemen have always worked past that age and even up to age seventy. As discussed hereinabove, the ERS, established in 1925, did not require retirement until the age of seventy. Even when the FPERS became effective in 1962, many firefighters, like the witness Grove, chose to remain covered by the earlier system and, like Grove, have continued to perform their duties satisfactorily after they reached the age of sixty. This continued employment of firefighters beyond the age of sixty has in no way affected the high caliber of the services performed by the Baltimore City Fire Department. As Chief O'Connor testified, the Baltimore City Fire Department, prior to 1962, was rated as one of the best in the country, and it continues to be so rated. It is difficult to understand how such a rating could have been achieved if all or substantially all of the Department's firefighters over the age of sixty

cannot now and could not for many years in the past perform their duties safely and efficiently.[12]

The further question raised is why an effort was not made at an earlier date to fix a retirement age of sixty, if the risk to the public was as great as defendants now contend. If anything, the burdens undertaken by an older firefighter are less today than they were in prior years. In 1953, firefighters worked a 66-hour week, but this has been reduced over the years to the present 48-hour week. Moreover, technological improvements over the years, including in particular the widespread use of oxygen breathing apparatus,[13] have made the job less onerous for both older and younger members of the Department.

Defendants' selection of the arbitrary age of sixty for the mandatory retirement of Baltimore firefighters is particularly suspect in view of what other municipal fire departments have done. A survey of the mandatory retirement ages of fire department personnel in thirty of the largest cities in the United States indicates that only four cities have a mandatory retirement age of sixty. Twenty-two cities have a retirement age of sixty-five or older or have no mandatory retirement age at all for firefighters.[14] Nothing in the record indicates that Baltimore Fire Department personnel perform duties any more arduous than those undertaken in other cities. To accept defendants' contention that substantially all firefighters above age sixty cannot safely and effectively perform their duties would indicate that a large number of fire departments across the country are inadequately or improperly manned.

10. Grove chose to remain a member of the ERS and is therefore not required to retire under City law until he becomes seventy years of age.

11. Plaintiff Robey was actively engaged in fighting a major fire between 12:00 midnight and 7:00 A.M. on April 24, 1981, which was only three days before this case came on for trial.

12. At the present time, there are eight City firefighters who are between the ages of sixty

and seventy, and sixty-five who are between the ages of fifty-five and fifty-nine.

13. This apparatus is designed to protect firefighters from smoke, carbon monoxide and other harmful gases at the scene of a fire.

14. Three cities require retirement at age sixty-three or sixty-four. Baltimore was the only city with a fifty-five year old retirement age for firefighters.

Defendants rely very heavily in this case on the medical evidence they have produced. Defendants argue that disease processes in persons aged fifty-five or older preclude the safe and efficient performance of their duties by firefighters over that age and that these medical conditions cannot be ascertained by means other than knowledge of the individual's age. It is asserted that the mandatory requirement of City law that firefighters retire at age fifty-five or sixty is based on sound physiological and medical data and is the most reliable way to remove firefighters with coronary disease from the Fire Department. Defendants contend that the expert testimony presented by them proves that it is impossible or highly impractical to deal with the retirement of Baltimore City firefighters over sixty on an individualized basis.

On the record here, this Court finds and concludes that defendants have not met their burden of proving that it is impossible or highly impractical to deal with the retirement of Baltimore City firefighters between the ages of sixty and sixty-five on an individualized basis. As to this issue, the expert testimony presented by plaintiffs was much more convincing than that of defendants. In particular, this Court found Dr. Samuel M. Fox, III to be a most impressive witness, and his testimony will be credited in substantial part. Dr. Fox is an experienced cardiologist who specializes in exercise testing.[15] He testified that the chronological age of an individual must of course be considered but that it is not determinative of that individual's ability to perform duties such as those required of a firefighter. Rather, exercise tolerance tests, supplemented by other tests and procedures if necessary, should be and can be used to determine whether a firefighter is physically and medically fit to perform his duties. Because of technological improvements in recent years, physicians can today much more readily test for cardiological problems which a fireman or other similar worker might have.

The testimony of Dr. Fox is supported by that of both Dr. Paul O. Davis[16] and Dr. Ellsworth R. Buskirk.[17] Neither of these witnesses is a physician, but both have extensive experience in exercise physiology. This Court accepts their testimony that age should not be the determining factor in ascertaining whether an individual between sixty and sixty-five is capable of performing physical tasks such as those required of a firefighter.[18] These witnesses conceded that increasing age unquestionably has an effect on physical performance and that aerobic capacity decreases with age.[19] But decreasing physical ability is offset by the experience and knowledge which an older employee has gained over the years. An older, more experienced firefighter is better equipped to pace himself and is more knowledgeable concerning unnecessary risks than the younger. Indeed, the evidence in this case indicates that younger firefighters receive more physical injuries than do older ones, apparently because younger firefighters assume more unnecessary risks.

Plaintiffs' expert witnesses also readily concede that firefighters as a class are particularly subject to heart disease and that the risk of heart disease increases with age. But facts such as these do not under the ADEA permit defendants to stereotype

---

15. Dr. Fox is a Professor of Medicine at Georgetown University School of Medicine, was formerly a member of the President's Council on Physical Fitness and Sports and is a past President of the American College of Cardiology. These are only a few of his many accomplishments.

16. Dr. Davis is particularly well qualified to testify concerning the duties required of a firefighter. He has been an active member of the Takoma Park (Md.) Fire Department since 1966.

17. Dr. Buskirk is a Professor of Applied Physiology at The Pennsylvania State University.

18. It was Dr. Davis' opinion that it is both possible and practical to determine plaintiffs' capacity and ability to continue to perform their jobs safely and efficiently by means of medical examinations, periodic reviews of current job performance and other objective tests.

19. After age seventy, deterioration in physical performance is more rapid. This fact has little significance in this case.

City firefighters between the ages of sixty and sixty-five and conclude that all or substantially all of them are no longer capable of performing their assigned duties safely and efficiently. As the Court said in *Aaron v. Davis*, 414 F.Supp. 453 (E.D.Ark.1976), at page 461:

> Generally, it is the relative ease with which possibly incapacitating defects are detectable that determines whether the qualifications imposed by the employer are job-related or "reasonably necessary to the normal operation of the particular business," as provided in the Act. In this area, a claim for exemption from the statute's proscriptions will not be permitted on the basis of the employer's *stereotyping assumption* that most, or even many, employees in a particular type of job become physically unable to perform the duties of that job after reaching a certain age. *See Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969). (Emphasis added)

The ADEA recognizes that stereotyping assumptions of an employer are not acceptable unless it is impossible or highly impractical to deal with members of a given class on an individualized basis. As the testimony of plaintiffs' experts indicate, it is both possible and practical to determine whether an individual firefighter between the ages of sixty and sixty-five is physically disabled from performing his assigned duties. In most cases, the cost of such testing is not great, and some of this cost will be paid under the Fire Department Health Care Program. Conventional risk factors can first be determined by way of interviews, and, in many instances where recognized risk factors are absent, further testing would not be required. Where indicated by the presence of one or more risk factors, a firefighter sixty years of age or older can take an exercise tolerance test (also referred to in testimony as an exercise stress test). As Dr. Fox testified, this is not an expensive test, and more expensive and more invasive testing mechanisms need be employed only in those instances where it is indicated that follow-up testing is required.[20]

The expert testimony relied upon by the defendants was less convincing than that of the plaintiffs. Neither Dr. Albert M. Antlitz nor Dr. Earl W. Ferguson has the experience that Dr. Fox has had in both cardiology and exercise tolerance testing. In his testimony, Dr. Antlitz indicated that he himself had examined a sixty-three year old officer of the Fire Department to determine whether that individual should be retired. Following his examination of sixty-three year old Fire Lieutenant Anthony V. Herr in 1978, Dr. Antlitz concluded that the cardiac status of this Fire Department officer, who had stopped working because of hypertension, would permit him to engage in his usual work as an officer with a truck company. However, at the trial, Dr. Antlitz testified that since 1978 he had learned what lieutenants now do in fire companies and that today he would not let Lt. Herr go back to fighting fires at age sixty-three. Thus, defendants' own evidence indicates that Fire Department personnel with cardiac problems can be evaluated on an individualized basis and retired if necessary. Other evidence in the record shows that examinations of the sort described by Dr. Antlitz (and testing, if necessary) could be successfully performed for plaintiffs and other firefighters between sixty and sixty-five years of age.

Dr. Alexander R. Lind, a physiologist called to testify by defendants, based his conclusion that substantially all firefighters over fifty-five could not properly perform their duties in large part on his study of miners in South Africa.[21] Such individuals hardly composed an appropriate class for comparison with Baltimore City firefight-

---

20. These more expensive and more invasive follow-up tests include radionuclide imaging and cardiac catheterization.

21. Dr. Lind testified in *Houghton v. McDonnell Douglas Corporation, supra*. In reversing the District Court's conclusion that defendant had met its burden in that case, the Eighth Circuit characterized the Company's evidence as being "of a general nature."

ers, since all of the miners studied were black and worked full eight-hour shifts in mines where it was very humid and where the temperature ranged from 85° to 100°.

What the ADEA requires in a case involving municipal workers like firefighters is a balancing of the right of each individual employee to continue to work in spite of his age against the risk to the public and to other employees created by the nature of the duties to be performed. As the Court said in *Aaron v. Davis, supra*, at 461:

> It is apparent that the quantum of the showing required of the employer is inversely proportional to the degree and unavoidability of the risk to the public or fellow employees inherent in the requirements and duties of the particular job. Stated another way, where the degree of such risks is high and methods of avoiding same (alternative to the method of a mandatory retirement age) are inadequate or unsure, then the more arbitrary may be the fixing of the mandatory retirement age.

In support of its conclusions in this case, this Court would cite and rely on both *Aaron v. Davis, supra* and *EEOC v. City of St. Paul, supra*. Both of those cases dealt with the rights of firefighters under the ADEA. In *Aaron*, an ordinance of the City of Little Rock required that all members of the fire department retire at age sixty-two. Following a trial, Chief Judge Eisele concluded that the record did not support the special relevance of the age sixty-two mandatory retirement requirement of the Little Rock ordinance. Accordingly, the Court held that the provisions of the ordinance in question were arbitrary, capricious and wholly lacking in any justifiable business necessity. 414 F.Supp. at 463.

In *City of St. Paul, supra*, a Minnesota statute and an ordinance of the City of St. Paul had established a mandatory retirement age of sixty-five for all uniformed fire department employees. Following a trial, District Judge Alsop held that provisions of this legislation requiring Fire Chiefs to retire at age sixty-five violated the ADEA. Noting that the only Chief

over age sixty-four about whom testimony had been presented could adequately perform his duties, the Court found that the evidence in the case did not give the City of St. Paul a factual basis for believing that substantially all Chiefs were unable to perform their duties safely and efficiently after the age of sixty-four. 500 F.Supp. at 1145.

In *City of St. Paul*, the Court upheld the challenged legislation insofar as it required the retirement of firefighters and captains at age sixty-five. 500 F.Supp. at 1144. Defendants argue that this part of the decision supports their contention that age is a BFOQ for firefighters. This Court would disagree. There is no inconsistency between this Court's decision that defendants have not on the record here met their burden of proving that retirement at age sixty is a BFOQ for firefighters and Judge Alsop's conclusion that the defendants in *City of St. Paul* had met their burden concerning such compulsory retirement at age sixty-five. Certainly as an employee's age increases, there is a decrease in the quantum of proof necessary for an employer to meet its burden of proving a BFOQ under § 623(f)(1). *Aaron v. Davis, supra* at 461. Plaintiffs have not in this case (as did the plaintiffs in *City of St. Paul*) sought to work beyond age sixty-five. Nothing contained herein is intended to suggest that Baltimore firefighters could not be required by the City to retire at age sixty-five, since that question is not before the Court in this case. The issue here has been whether defendants have met their burden of proving that retirement at age sixty is a BFOQ for City firefighters. This Court finds that they have not.

In sum, the Baltimore City law in question, as applied to these plaintiffs and others like them, violates the ADEA because it sets an arbitrary age limit for terminating the plaintiffs' employment. As they have done all their lives, plaintiffs keenly wish to continue to work as firefighters until they are sixty-five. Section 34(a) does not permit plaintiffs' performance to be measured in terms of their ability. Rather, an arbi-

trary line has been drawn based on stereotyped assumptions. Plaintiffs have been told that solely because of their age, their services are no longer required. In this case, defendants have failed to meet their burden of proving that, when a firefighter becomes sixty, age is an occupational qualification reasonably necessary to the normal operation of the Baltimore City Fire Department. The provisions of § 34(a)(2) and (4) of Article 22 of the Baltimore City Code, as applied to plaintiffs and others like them, therefore violate the ADEA.

## VII

### The claim of plaintiff Porter

Plaintiff Porter is the only one of the six plaintiffs in this case who was not employed by the Fire Department on July 1, 1962. Under § 34(a)(2), he must therefore retire at age fifty-five. Defendants contend that since plaintiff Porter is presently thirty-two years of age, he is not a proper plaintiff in this suit.

Defendants argue that plaintiff Porter is not one of those persons protected by the ADEA, since the prohibitions of the Act are limited "to individuals who are at least forty years of age but less than seventy years of age."[22] 29 U.S.C. § 631. However, when read together with the rest of the statute, this provision does no more than define the acts prohibited by the statute and would not deprive plaintiff Porter of standing in this case. If Porter survives and is still employed by the Fire Department when he attains the age of fifty-five, he will clearly be protected by the Act. More importantly, since this Court has found that the provisions of § 34(a) which mandate retirement of a City firefighter at age sixty violate the ADEA, *a fortiori* the provisions of the legislation which mandate that plaintiff Porter must retire at age fifty-five are likewise invalid.

The essential question which must be addressed in determining whether plaintiff Porter has standing is whether his claim is now ripe for adjudication. Defendants assert that since Porter will not have to retire until the year 2003, his claim is too speculative to be considered by this Court at this time. Relying on *Eccles v. Peoples Bank*, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed.2d 784 (1948), defendants argue that there are many contingent events which might occur before plaintiff Porter is required to retire, and that the occurrence of any one of these events would render moot any decision made by this Court as to him.

When the legislation in question is considered from a practical point of view, this Court concludes that abstract concepts of justiciability should be disregarded. This suit challenges provisions of § 34(a) of Article 22 of the Baltimore City Code. Two groups of employees are affected by the legislation, those who joined the Fire Department prior to July 1, 1962 and those who, like plaintiff Porter, began their employment after that date. The provisions of the law applying to these two separate groups are hardly severable. Quite obviously, if the ADEA invalidates provisions of the City Code which require mandatory retirement of a firefighter at age sixty, that Act likewise invalidates similar provisions mandating retirement at age fifty-five. The principle of statutory severability plays a special role when a court is presented with questions of ripeness. *See* Wright, Miller & Cooper, *Federal Practice and Procedure*, § 3532 at 258 (1975). Inseverability, therefore, may make ripe issues that otherwise would be better deferred. *Id.* at 259; *see Carter v. Carter Coal Company*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). As the Court of Appeals of Maryland said in *Heubeck v. Mayor and City Council of Baltimore*, 205 Md. 203, 211, 107 A.2d 99 (1954), an Act must fall entirely if the effect of declaring a portion of it invalid would render the remainder incapable of effecting the purpose for which the Act was enacted.

Under the particular circumstances of this case, considerations of judicial economy lead this Court to the conclusion that plain-

---

**22.** The 1978 amendments to the Act increased the top age limit from sixty-five to seventy.

tiff Porter's claim is ripe for determination at this time. It would make little sense, in view of the findings and conclusions made herein, to defer consideration of Porter's claim until a later date. Accordingly, plaintiff Porter is entitled to a declaratory judgment and injunction prohibiting defendants from enforcing provisions of § 34(a) which mandate that he must retire at age fifty-five.

## VIII

### Plaintiffs' other claims

In view of this Court's conclusion that § 34(a)(2) and (4) of Article 22 of the Baltimore City Code violates provisions of the ADEA, it is not necessary to determine whether this City law likewise contravenes 42 U.S.C. § 1983 and the Fourteenth Amendment. However, it should be noted that the Fourth Circuit's decision in *Arritt v. Grisell, supra,* makes it very doubtful that plaintiffs would prevail insofar as their alternative claims are concerned.

In the second part of the *Arritt* opinion (567 F.2d 1271–1272), the Fourth Circuit upheld the District Court's granting of summary judgment in favor of the defendants as to plaintiff's claim that the West Virginia statute violated § 1983 by denying the plaintiff's right to the equal protection of the laws. Relying on *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), the Fourth Circuit concluded that it could not be said that the age limitation contained in the West Virginia statute did not rationally further a legitimate state purpose insofar as the claim based on the equal protection clause, as distinguished from the statutory claim under the ADEA, was concerned. As Judge Thomsen pointed out, there is no inconsistency in concluding that a statute violates the ADEA but does not violate the Equal Protection Clause of the Fourteenth Amendment, since legislation "authorized by § 5 of the Fourteenth Amendment can prohibit practices which would pass muster under the Equal Protection Clause, absent an act of Congress." 567 F.2d at 1272.

In any event, in this case, it is not necessary to consider in detail the arguments presented by the plaintiffs in seeking to distinguish this case from *Arritt* and *Murgia.* Plaintiffs are entitled to the relief they seek under the ADEA, and there is therefore no need for this Court to go on and undertake to analyze the evidence in terms of plaintiffs' claims asserted under § 1983 and the Fourteenth Amendment.

## IX

### Conclusion

For the reasons stated, plaintiffs are entitled to the relief they seek. Plaintiff Johnson is entitled to a judgment in the amount of $1,000.00, representing back pay due him from May 1 to June 11, 1979. All plaintiffs are entitled to a declaratory judgment, a permanent injunction and costs. In addition, plaintiffs are entitled to attorneys' fees in an amount to be determined by the Court at a later date. Counsel should meet and undertake to agree on the form of an Order to be entered herein.